UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 91-6248

_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

ROMEO TRINIDAD FLORES, JR.,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court for the
                Southern District of Texas
_____

(February 25, 1993)

Before POLITZ, Chief Judge, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

     Defendant-appellant Romeo Trinidad Flores, Jr. (Flores) appeals his conviction of conspiracy to possess with intent to distribute in excess of 1,000 kilograms of marihuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A).  Flores claims, among other things, that his Sixth Amendment rights under the Confrontation Clause were violated by the admission against him of grand jury testimony of his codefendant, Oscar Navarro (Navarro), who did not testify at trial.  We agree, and accordingly reverse and remand for another trial.

**Facts and Proceedings Below**

On May 22, 1990, federal agents established surveillance of a ranch, abutting the United States border on the shores of Falcon Lake near the town of Lopeno, Texas, on the suspicion that a large shipment of marihuana would shortly be brought there from Mexico. At approximately 10:00 p.m., agents observed a dump truck travel south on Highway 83, pull off the highway, turn off its lights, and enter the ranch on a caliche road by a livestock dipping bath and a parked Ford Bronco, which had been observed earlier entering the ranch. After voices were heard in conversation, the two vehicles proceeded on the caliche road to the banks of Falcon Lake.

At approximately 4:00 a.m., federal agents observed a red Chevrolet Lumina travelling north on Highway 83 from Lopeno.[1] The vehicle stopped near the dipping bath and several persons in the car were yelling in Spanish toward that area. A man got out of the passenger side, yelled toward the dipping bath, and reentered the Lumina, which then made a U-turn and returned towards Lopeno. Moments later, the Lumina returned with a person sitting on the passenger-side door frame, yelling toward the dipping bath area. The passenger exited the vehicle and the driver turned around and again drove toward Lopeno. A few minutes later the Lumina returned, picked up the passenger at the ranch gate, and then went back towards Lopeno. About five minutes later, the Lumina again appeared, and, after stopping on the road near the dipping bath, the vehicle's two occupants could be heard conversing about when the truck was due to come out. A Bronco exiting the ranch with its

---

[1] This vehicle was later identified as being registered to Flores' wife.

2

lights off stopped at the ranch entrance and its occupants appeared to speak with the occupants of the Lumina. The Bronco then entered Highway 83, turned on its lights, and drove north towards Zapata. The Lumina entered the ranch with its headlights turned off and travelled in the direction of a dump truck before disappearing. A dump truck later emerged from the caliche road with the Lumina following behind it. The dump truck turned on its lights and headed north from the ranch's entrance onto Highway 83, and was followed by members of the surveillance team. Before following in the dump truck's direction, the Lumina's three occupants exited the car and closed the gate to the ranch. The Lumina was not followed by the agents. About half an hour later, federal agents stopped the dump truck northeast of Zapata, Texas, on Highway 16 and seized 2,768 pounds of marihuana that it was carrying.

The Lumina was not observed again until about thirty minutes later, when a patrolman stopped the car twenty to twenty-five miles north of the ranch, outside of Zapata, Texas, on Highway 16.[2] The patrolman observed that Flores was driving the car, a passenger was riding in the front seat, and Navarro was in the back seat. After searching the car, the patrolman directed Flores to follow him back to the Zapata police station to pay some outstanding traffic tickets. Flores did so and then hurriedly left.

About a year later, on April 29, 1991, members of the surveillance team questioned Navarro at his home about his role in

---

[2]    There was evidence at trial that Flores owned horse stables and an associated exercise track "on the south side" of Highway 16 in the "area that connects U.S. Highway 83 and Highway 16."

the marihuana shipment.  Navarro initially refused to talk, but he changed his mind when told he was the target of an investigation. After being given his *Miranda* warnings, Navarro admitted that he was involved in the shipment.  The federal agents then asked him to accompany them to the customs office.  He voiced some concerns about his legal status because he was on probation for another offense, but ultimately decided to go with the agents.[3]  The agents then drove Navarro to the customs office where he signed a statement concerning the details of the shipment.  This confession described Flores as participating in the marihuana conspiracy by engaging in countersurveillance activity along Highway 83 while the marihuana shipment was being loaded.[4]

On May 3, Navarro testified before a grand jury concerning the marihuana shipment.[5]  He was without counsel, and was questioned by

---

[3]     The testimony of the agents at a pretrial hearing before the district court does not explain how Navarro's concerns regarding probation were resolved.  At this hearing on August 28, 1991, the following colloquy occurred:

> "The Court:  Did he ask you for any consideration or anything?
>
> The Witness:  Not that I can remember, your Honor.  He might've stated what could happen to him, but I just . . . I don't remember that happening.  I don't remember him really asking us anything.  He was worried about his mother and he said that he wanted to cooperate.  He really didn't want anything to go wrong and he was worried about his mother because his mother had diabetes.  So we said, well, by cooperatingSO"

[4]     Although this statement was admitted at trial, all references to Flores were deleted.

[5]     It is not clear whether Navarro was subpoenaed for this purpose, but he was called as a witness by the Assistant United States Attorney, and was brought to the grand jury from his home by the customs agents.

4

the Assistant United States Attorney. Of course, neither Flores nor his counsel was present. Navarro's grand jury testimony, echoing his confession in the customs office, incriminated him and also contained inculpatory statements indicating that Flores specifically, among others, was involved in the conspiracy. Based on this testimony, on July 9 Navarro and Flores were charged in a one-count indictment with conspiracy to possess with intent to distribute in excess of 1,000 kilograms of marihuana.

On August 6, the government filed a notice of intent to use Navarro's grand jury testimony pursuant to Fed. R. Crim. P. 12(d). Flores objected, and during a pre-trial hearing on August 12 argued that since he and Navarro were being tried together, and since Navarro had indicated that he would not take the stand and would assert his Fifth Amendment privilege, that therefore the admission of the grand jury testimony would violate Flores' rights under the Sixth Amendment's Confrontation Clause. The district court took this argument under advisement and Flores filed supplemental objections to the grand jury testimony on August 14. He filed further written objections and a motion for severance on August 23. The court summarily denied the motion for severance but allowed Flores to file additional grounds to exclude the grand jury testimony. On August 27, Flores formally identified specific objectionable portions of Navarro's grand jury testimony, and the next day, following an evidentiary hearing, the district court determined that most of the testimony had particularized guarantees of trustworthiness based on the circumstances surrounding the

5

testimony and on the corroborating evidence implicating Flores.[6] The district court then redacted certain portions of Navarro's grand jury testimony and, over Flores' objections, allowed the remaining testimony to be admitted against Flores as well as against Navarro.[7] Navarro exercised his Fifth Amendment right not to testify at trial.

A jury trial involving codefendants Flores and Navarro began

---

[6]     As to the corroborating evidence, the district court reasoned as follows:

> "The Court:  And so, then yourSQwell, so his statement would essentially just furnish the link between the Lumina, as it went into the ranch, and the Lumina as it was stopped thirty minutes later or so.
>
> Mr. Casso [prosecutor]:  Yes, sir.  And would identify Mr. Flores as the one who was driving
>
> The Court:  Okay.  But you know, you're going to have independent evidence that he was in fact driving it thirty minutes later.
>
> Mr. Casso:  Absolutely.
>
> The Court:  With Navarro in the back seat.
>
> Mr. Casso:  That's right.
>
> The Court:  So, this will just bridge the gap of the thirty minutes?
>
> Mr. Casso:  That's right."

The district court also noted that the Lumina's presence at the ranch that evening at and before the time the marihuana truck left the ranch was corroborated by independent evidence.

[7]     Three portions of Navarro's grand jury testimony concerning Flores remained after the redactions.  They consisted of statements that: (1) Flores was driving the Lumina when he picked up Navarro at the ranch; (2) Flores was not present when the marihuana was physically loaded into the truck; and (3)  Flores had contacted Navarro the day before about assisting in the offense.

on August 28, and the next day both were convicted of conspiracy to possess with intent to distribute in excess of 1,000 kilograms of marihuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). On November 6, 1991, Flores was sentenced to twenty years' imprisonment to be followed by a ten year term of supervised release, and ordered to pay a fine of $7,500. Flores now appeals his conviction asserting that the district court erred in, among other things, admitting Navarro's grand jury testimony.[8]

## Discussion

Flores complains that his Sixth Amendment rights under the Confrontation Clause were violated because of the admission against him of the grand jury testimony of his codefendant Navarro, who exercised his Fifth Amendment right not to testify at trial.[9]

---

[8]   Flores also complains of the denial of his motion for severance, in which he alleged no more than that he "intends to call the said Oscar Navarro to testify on his behalf." Neither the motion, nor any showing made by Flores in support of it, met the criteria of *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990), and the district court did not abuse its discretion in denying the motion.
      Flores makes no challenge to the sufficiency of the evidence.

[9]   Flores further asserts that Navarro did not properly invoke his Fifth Amendment right not to testifySQand hence may not be deemed to have been in any respect unavailable on that accountSQbecause he did not do so personally, on the witness stand, in open court. For the same reason, Flores argues that the district court erred in not allowing him to call Navarro to the stand in the presence of the jury and attempt to question him. Twice during trial (and before Navarro's grand jury testimony was put in evidence), Navarro's counsel advised the district court in open court, outside the presence of the jury, that he had consulted with Navarro (who was then present) and that Navarro invoked the Fifth Amendment and would not take the stand (as indeed he did not). The court then confirmed from Navarro personally that he understood this. After the government and Navarro rested, Flores' counsel, in the presence of the jury, announced "we call the defendant to the stand, Oscar Navarro";

7

Flores asserts that Navarro's grand jury testimony did not have the required indicia of trustworthiness. Such indicia must be shown in order to admit a statement under the hearsay exception provided by Fed. R. Evid. 804(b)(3).[10]

---

Navarro's counsel promptly stated that Navarro "would assert his Fifth Amendment right"; and the district court at once excused the jury and admonished Flores' counsel for his improper conduct. The jury was then returned, Flores' counsel proceeded to call another witness, and the matter was not mentioned again. We conclude that the district court did not abuse its discretion in determining that Navarro had adequately invoked his Fifth Amendment privilege, notwithstanding that he did not personally utter the magic words or take the stand. As Justice Blackmun observed, "the absence of this formality is not decisive." *Lee v. Illinois*, 106 S.Ct. 2056, 2066 n.3 (1986) (Blackmun, J., dissenting). *See also United States v. Briscoe*, 742 F.2d 842, 846 (5th Cir. 1984).

We also reject Flores' claim that Navarro was mentally or emotionally incompetent. Flores points only to testimony of a doctor who stated that, during his court-ordered examination of Navarro nine days before trial, Navarro told him "I was tricked by an undercover agent to say many things that were not true and they were all against me." However, nothing in Navarro's grand jury testimony, or elsewhere in the record, reflects that he was incapable of understanding the questions asked or communicating the relevant material or understanding the obligation to do so truthfully. *See United States v. Saenz*, 747 F.2d 930, 936 (5th Cir. 1984).

[10] The rule provides in pertinent part that a statement will qualify under this exception if "at the time of its making . . . [it] so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3). This Court has held that a declaration against penal interest satisfies the requirements of the Confrontation Clause and rule 804(b)(3) if it meets a three-part test:

"(1) The declarant must be unavailable;

(2) The statement must so far tend to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and

(3) The statement must be corroborated by circumstances clearly indicating its trustworthiness."

8

The district court reviewed Navarro's testimony to determine its admissibility against Flores under this Court's decision in *United States v. Vernor*, 902 F.2d 1182 (5th Cir.), *cert. denied*, 111 S.Ct. 301 (1990). The *Vernor* court held that in the case of custodial confessions, "[a] close examination of all the circumstances surrounding the making of the statement is required in order to determine whether it so contravenes the declarant's penal interest that a reasonable person in his position would not have made the statement accusing a third person unless he believed it to be true." *Id.* at 1187-88, quoting *Sarmiento-Perez*, 633 F.2d at 1102. In addition to reviewing the circumstances surrounding the confession, the district court here relied on independent evidence that placed Flores in the car thirty minutes after it was observed leaving the ranch and thus corroborated that portion of Navarro's grand jury testimony that placed Flores at the scene of the conspiracy. Based on these findings the district court concluded that the testimony had sufficient indicia of reliability to be admitted against Flores as a declaration against penal interest under Fed. R. Evid. 804(b)(3). The district court's analysis was consonant with *Vernor,* which held that corroborating evidence is to be consideredSQin addition to the circumstances surrounding the statementsSQto satisfy the requirement of reliability under rule 804(b)(3) and the requirement of trustworthiness under the Confrontation Clause. *Vernor*, 902 F.2d

---

*United States v. Sarmiento-Perez*, 633 F.2d 1092, 1101 (5th Cir. 1981).

at 1188. However, the Supreme Court has since held that corroborating evidence may not be considered in determining whether a statement may be admitted under the Confrontation Clause where, as here, the statement is presumed to be unreliable. *Idaho v. Wright*, 110 S.Ct. 3139 (1990).[11]

The *Wright* Court, in applying the Confrontation Clause's requirements to Idaho's residual hearsay exception, noted that there existed two basic frameworks for analyzing the constitutionality of hearsay exceptions as set forth in *Ohio v. Roberts*, 100 S.Ct. 2531 (1980). Generally, under both systems, the Confrontation Clause requires the prosecution to show that the declarant is unavailable and that the statement bears adequate indicia of reliability. *Id.* at 2538-39. If the hearsay falls within a firmly rooted hearsay exception then reliability may be presumed. *Id.* at 2539. However, if the hearsay is not part of a firmly rooted exception, then the required indicia of reliability must be shown from "particularized guarantees of trustworthiness." *Id.* The *Wright* Court held that these "particularized guarantees of trustworthiness" include *only* the relevant circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright*, 110 S.Ct. at 3148. Corroborating evidence may not be considered because it "would permit . . . bootstrapping on the trustworthiness of other evidence

---

[11]     In so ruling, the Supreme Court appears to have departed from the plurality ruling in *Dutton v. Evans*, 91 S.Ct. 210 (1970). In *Dutton*, four members of the Court stated that a court evaluating the reliability of hearsay evidence could look to corroborating evidence as one factor in determining the reliability of the hearsay. *Id.* at 219.

10

at trial." *Id.* at 3150.[12]

The *Wright* court determined that Idaho's residual exception to the hearsay rule was not a firmly rooted exception so that evidence may only be admitted under that exception if it had "particularized guarantees of trustworthiness." Similarly, a confession by an accomplice inculpating a defendant that is being offered as a declaration against penal interest is not a firmly rooted exception. Although some statements that fall within the declaration-against-penal-interest concept may be inherently reliable, the concept itself "defines too large a class for meaningful Confrontation Clause analysis." *Lee v. Illinois*, 106 S.Ct. 2056, 2064 n.5 (1986). Therefore, each class of statements that falls within the exception must be analyzed to determine whether it is inherently reliable.[13] Confessions of accomplices or

---

[12] This test excludes corroborating evidence because the rationale for allowing exceptions to the hearsay rule is "that the statement offered is free enough from risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation." *Wright*, 110 S.Ct. at 3149 (quoting from 5 J. Wigmore, Evidence § 1420, p. 251 (J. Chadbourne rev. 1974)). In other words, evidence may only be admitted under an exception to the hearsay rule if it is "so trustworthy that adversarial testing would add little to its reliability." *Id.* The hearsay rule supports the values of the Confrontation Clause because it focuses only on the trustworthiness of the declarant in making the particular statement and does not seek independent verification of the statement through corroborating evidence. Hearsay consisting of a statement of declarant that is not trustworthy is inadmissible whether or not independent evidence shows that the statement is in actuality true or false.

[13] Three circuits have held that all statements within the declaration-against-penal-interest exception are inherently reliable since it is a "firmly rooted" exception to the hearsay rule. *United States v. York*, 933 F.2d 1343 (7th Cir. 1991); *United States v. Seeley*, 892 F.2d 1, 2 (1st Cir. 1989); *United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983).

11

codefendants are "presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another."  *Id.* at 2064.

Navarro's grand jury testimony is a confession of a codefendant, and it may only be admitted against Flores if the relevant circumstances "that surround the making of the statement . . . render the declarant particularly worthy of belief."  *Wright*,

---

However, *Katsougrakis* was decided before *Lee*, and *Seeley* simply relies on *Katsougrakis*.  These opinions cannot be viewed as authoritative given the holding in *Lee* that the types of statements under this exception defy such categorical analysis.
    The *York* court distinguished *Lee* by holding that it applied only to "'a confession by an accomplice which incriminates a criminal defendant,'" and that the *Lee* court had not held that such statements were not within a firmly-rooted exception but only decided that they were presumptively unreliable.  *Id.* at 1363 n.4 (quoting *Lee*, 106 S.Ct. at 2064 n.5).  The *York* court concluded that the issue of whether the exception for declarations against penal interest was firmly rooted was still open, and then held that it was a firmly rooted exception.  *Id*. We decline to follow this reasoning because exceptions are firmly rooted precisely because such exceptions contain statements that are presumptively reliable.  Therefore, *Lee* precludes a finding that the exception could be firmly rooted.  The *York* court implicitly recognized this outcome when it noted that, although the exception is firmly rooted, a district court will still need to determine the reliability of a statement against interest that inculpates a third party in order to allow the statement to be admitted under the exception.  Such an instruction contradicts the Supreme Court's holding that firmly rooted exceptions are presumptively reliable and require no further determination of reliability.  *Wright*, 110 S.Ct. at 3147.  *York* also seems to contradict *Morrison v. Duckworth*, 929 F.2d 1180, 1181 n.2 (7th Cir. 1991) (holding that statements inculpating a third party "do not come within an established hearsay exception").  Moreover, as noted in the text, *infra*, from an historical perspective we doubt that a broadly read exception for declarations against penal interest can fairly be described as "firmly rooted" despite some relatively old instances of its application in England.

12

110 S.Ct. at 3148.[14]    However, the district court considered

---

[14]    The government correctly observes that Navarro's grand jury testimony, although a confession, was not a custodial confession. Certainly, grand jury questioning will usually "take place in a setting wholly different from custodial police interrogation." *United States v. Mandujano*, 96 S.Ct. 1768, 1778 (1976). However, although Navarro was not arrested when the testimony was elicited, he was a target of the federal investigation, he had been given his *Miranda* warnings, and he had already given a custodial confession that could serve as the basis for his arrest.  All of these facts were known by Navarro and the prosecuting attorney when he elicited Navarro's testimony.  In these circumstances, we are inclined to view the grand jury confession as not vastly more trustworthy than the preceding custodial confession.
   This Court has observed that the fact that the challenged hearsay was grand jury testimony was not decisive in favor of its trustworthiness because, "although given under oath, [it] is not subjected to the vigorous truth testing of cross-examination." *United States v. Thevis*, 665 F.2d 616, 629 (5th Cir. 1982).  If an oath (and a noncustodial, formal setting) were a sufficient guarantee of trustworthiness, "Congress could have dispensed with the cross-examination requirement codified in Rule 804(b)(1)." *United States v. Fernandez*, 892 F.2d 976 at 981 (11th Cir. 1989). Further, here, as is frequently the case in such instances, much of Navarro's grand jury testimony was elicited through leading questions (and included hearsay), factors that tend to lessen reliability.  *See United States v. Gonzalez*, 559 F.2d 1271, 1273 (5th Cir. 1977).  Simply put, accomplice or codefendant grand jury testimony, in and of itself, does not exhibit sufficient indicia of reliability.  *See United States v. Garner*, 99 S.Ct. 333, 335 (1978) (Stewart, J., dissenting from denial of certiorari) ("That the evidence was first given before a grand jury adds little to its reliability.  In grand jury proceedings, the ordinary rules of evidence do not apply.  Leading questions and multiple hearsay are permitted and common.  Grand jury investigations are not adversary proceedings.  No one is present to cross-examine the witnesses, to give the defendant's version of the story, or to expose weaknesses in the witnesses' testimony.").
   We concede that generally grand jury testimony is likely to be somewhat more trustworthy than custodial confessions, and hence is *in this respect* arguably more consistent with recognized exceptions to the hearsay rule.  However, grand jury testimony, as compared to custodial confessions, will also usually have a closer nexus to building a particular case for trial as distinguished from mere general investigation of criminal activity or identification of suspects for apprehension.  As such, the use at trial of third-party grand jury testimony implicates core concerns of the Confrontation Clause at least as much as the use of custodial confessions.

corroborating evidence in addition to the circumstances surrounding the making of the statement.[15]  This situation resembles *United States v. Gomez-Lemos*, 939 F.2d 326 (6th Cir. 1991), where two co-conspirators' grand jury testimony was used against the defendant at trial.  The testimony was admitted as a declaration against penal interest, the co-conspirators having made themselves unavailable by evoking their Fifth Amendment privilege not to testify.  The Court held, under *Wright*, that the district court committed error in admitting the grand jury testimony because it "found significant in its reliability analysis the fact that the hearsay testimony of co-conspirators Barraza and Osorio was corroborated." *Id.* at 332.  Since the district court, contrary to *Wright*, considered corroborating evidence in support of its decision to admit Navarro's testimony, its decision may not stand.

The question remains whether we should regard *Vernor* as binding precedent for the admissibility of this character of evidence even where, per *Wright*, external corroborating evidence may no longer be considered in the trustworthiness calculation.  We decline to ascribe such a continuing precedential effect to *Vernor*.  We are not persuaded that the result in *Vernor* itself, or the general pro-admissibility approach of that opinion, would have been the same absent the comfort factor of external corroborating evidence, a factor that under *Wright* is no longer available in

---

[15]    We note that the government likewise urges that we uphold the admission of Navarro's grand jury testimony in significant part because of the external corroborating evidence.

calibrating trustworthiness.[16]  Moreover, we believe that the type of evidence here considered should be deemed inadmissible in light of the historical underpinnings and core values of the Confrontation Clause, and what we view as the infringement of those values in this general context by the evolutionary expansion of the concepts of unavailability and declaration against penal interest.

Certainly, the Confrontation Clause does not serve as an impregnable barrier to the admission of any and all hearsay evidence.  The theory behind the hearsay rule is that "the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination."  5 Wigmore, *supra*, § 1420 p. 251.  Based on this theory, confrontation is not always required if the statement is "so trustworthy that adversarial testing would add little to [its] reliability." *Wright*, 110 S.Ct. at 3149.  The Confrontation Clause couples with this trustworthiness requirement the additional

---

[16]  *Vernor* recites that "[t]he district court found that Fred's statements implicating Gary were corroborated by other evidence that clearly indicated the trustworthiness of the statements" and that "[t]he portions of Fred's statements implicating Gary are also sufficiently corroborated by other circumstantial evidence of Gary's guilt." *Id*. at 1188.  The latter statement introduces a four paragraph description of the corroborating evidence. *Id*. Following this description, the opinion concludes by stating:

> "In the light of all of the foregoing circumstances, we conclude that the trustworthiness of Fred's statements is clearly established by corroborating circumstances, and that there are sufficient indicia of reliability to satisfy the requirements of the confrontation clause.  We therefore hold that the district court did not err in admitting Fred's statements." *Id.* at 1188-89.

15

safeguard that necessity must be shown before the statement can be admitted. *Roberts*, 100 S.Ct. at 2538-39. In order to prove necessity, the Supreme Court has held that the Confrontation Clause requires a showing of unavailability in order to admit hearsay such as confessions. *See United States v. Inadi*, 106 S.Ct. 1121, 1125-1129 (1986); *Roberts, supra*; *Mattox v. United States*, 15 S.Ct. 337 (1895). However, circumstances that constitute unavailability have been enlarged over time. As noted by one court:

> "Originally, the test of unavailability was satisfied only if the declarant was deceased at the time of trial. As the exceptions to the hearsay rule grew, the concept of unavailability also expanded, and forms of unavailability other than death were recognized as sufficient to satisfy the test of necessity. Illness, insanity, absence from the jurisdiction, and supervening incompetency by virtue of interest have all been held to satisfy the unavailability requirement. The unavailability principle has been expanded to include a witness who, by the exercise of privilege, refused to testify." *Naylor v. Gronkowski*, 9 Ill. App. 3d 302, 306-07, 292 N.E.2d 227, 229-30 (1972).

Such an expansion was at least in part a salutary development since unavailability, in a practical sense, may occur in several forms besides the demise of the declarant.[17] However, the courts have

---

[17] Fed. R. Evid. 804(a), which defines unavailability for purposes of all the several hearsay exceptions that are conditioned on it and are set out in rule 804(b), includes the situation where the defendant "is exempted by ruling of the court on the ground of privilege from testifying." Rule 804(a)(1). In *Vernor* we relied on this provision and several earlier decisions of this Court in holding that the co-perpetrator's claim of Fifth Amendment privilege rendered him unavailable as a witness so as to authorize admission of his confession against the defendant. *Id*. at 1186. However, in *Lee* the Court expressly declined to address whether the confessing co-defendant Thomas who declined to testify at trial was unavailable. *Id*., 106 S.Ct. at 2061. Even the four dissenting Justices in *Lee*, who would have admitted Thomas's confession against his co-defendant, recognized that there *were* ways the State might well have been able to procure Thomas's live testimony:

16

generally not considered the effects of the expansion of unavailability as they interact with other evolving legal concepts.

As with the concept of unavailability, the exception for declarations against interest has greatly expanded from its historical roots. In England, although statements against penal interest may on occasion have been admitted in the distant past, the courts ruled in the mid-nineteenth century against the existence of such an exception. *Sussex Peerage Case*, 11 Cl. & F. 85, 110 (1844); *Davis v. Lloyd*, 1 C & K. 276 (1844); *Papendick v. Bridgwater*, 5 E. & B. 166, 180 (1855). In the United States, common-law hearsay exceptions existed for statements made against pecuniary or proprietary interest, but no exception existed for declarations against penal interest. 5 Wigmore*, supra*, § 1476 p. 352-58. Defendants who were attempting to use declarations by third parties as evidence in their favor sought to have this exception recognized, but this attempted common-law expansion was rejected by the Supreme Court in *Donnelly v. United States*, 33 S.Ct. 449 (1913).

The *Donnelly* court considered whether the confession of a third party exculpating the defendant should be admitted as evidence. *Id.* at 459. The Court determined that it should not,

---

"For example, the State could have offered Thomas a favorable sentencing recommendation, or the opportunity to plead guilty to a lesser offense, in exchange for his testimony against petitioner. Alternatively, the State could have tried Thomas separately and granted him immunity from the use of his inculpatory testimony against petitioner. . . . Measures of this kind, however, entail significant costs." *Id*. at 2067 (Blackmun, J., dissenting).

17

because although a recognized exception to the hearsay rule existed concerning declarations against interest, "it is almost universally held that this must be an interest of a pecuniary character . . . In this country there is a great and practically unanimous weight of authority in the state courts against admitting evidence of confessions of third parties . . . ." *Id.* at 459-60. *Donnelly* also relied on *Sussex* and on Justice Marshall's opinion in *Queen v. Hepburn*, 3 L.Ed. 348 (1813), which observed, "The danger of admitting hearsay evidence is sufficient to admonish courts of justice against lightly yielding to the introduction of fresh exceptions to an old and well-established rule; the value of which is felt and acknowledged by all." *Id.* at 350.[18]

However, such an exception would be eventually recognized as predicted in Justice Holmes' famous dissent in *Donnelly*:

> "There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder; it is far more calculated to convince than dying declarations, which would be let in to hang a man; and when we surround the accused with so many safeguards . . .; I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight." 33 S.Ct. at 461 (Holmes, J., dissenting) (citations omitted).

Cast in these terms, such admissions against penal interest did not implicate the Sixth Amendment because they would be statements of

---

[18] And, at least until recently, most courts agreed that a codefendant's hearsay admissions could not be used against a defendant. 4 Wigmore, *supra*, § 1076 p. 157 (concerning "the rule in regard to the admissions of a *codefendant in a criminal case*; here it has always been conceded that the admission of one is receivable against himself only").

18

third parties offered by an accused in order to exonerate himself. Criticism for not recognizing an exception for statements against penal interest focused on this perceived injustice.

This criticism was muted by the promulgation of the Federal Rules of Evidence in 1975, which provided that a declarant's statement against interest may be admitted as an exception to the hearsay rule where such statement "so far tended to subject the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3).[19] This rule recognized the general reliability of statements made by a declarant that were opposed to his own penal interest. However, echoing the concerns of the *Donnelly* majority, the rule treats statements by a third-party exculpating the defendant as requiring "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement." *Id.*

Although rule 804 does not specifically address the situation where the third-party declarant's confession contains statements inculpating the defendant, the Supreme Court has always viewed such statements as inherently suspect. *Douglas v. Alabama*, 85 S.Ct. 1074 (1965) (admission of nontestifying previously tried codefendant's confession violated the defendant's rights under the Confrontation Clause); *Bruton v. United States*, 88 S.Ct. 1620 (1968) (admission of nontestifying jointly tried codefendant's confession with a limiting instruction still violated the defendant's rights under the Confrontation Clause). The rules advisory committee notes to rule 804(b)(3) also recognize this

---

[19] For a detailed, scholarly history of the rule's language, see *Sarmiento-Perez*, 633 F.2d at 1094-95.

inherent unreliability in positing that "a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest." *West's Federal Criminal Code and Rules* 287-88 (1991 rev. ed.).

The relatively recent recognition of declarations against penal interest as an exception to the hearsay rule by the Federal Rules of Evidence would seem to counsel against a headlong rush to broadly embrace the exception as providing a sufficient substitute for cross-examination and personal confrontation in cases of the present kind. We recognize that statements which adversely implicate the penal interest of the declarant alone for many years have been widely recognized as normally reliable and, where the declarant is unavailable, have usually been admitted in evidence in federal and most state courts. *See* E. Clearly, *McCormick on Evidence* § 278 (3d ed. 1984). Arguably, such statements may be deemed a "firmly rooted" exception to the hearsay rule under the *Lee* formulation. On the other hand, even generally objectionable statements in which the declarant adversely implicates not only his own penal interest but also that of another may be made under circumstances that both suggest reliability and do not seriously invade the intended protections of the Confrontation Clause, such as statements made to a personal acquaintance in a noninvestigatory context where the setting suggests no motive to speak falsely. This distinction seems to be recognized by the rules advisory committee's reference to statements made "to an acquaintance." *West's Federal Criminal Code and Rules* at 288 (advisory committee

20

notes to rule 804(b)(3)).  *Cf. United States v. Triplett*, 922 F.2d 1174, 1178, 1182 (5th Cir. 1991) (statement to neighbor).  Such statements might well fall into the *Lee* category of those shown to have "particularized guarantees of trustworthiness."

It appears to us, however, that there is another category of statements against penal interest that should generally be regarded as inadmissible under the Confrontation Clause, particularly where the declarant's unavailability is due simply to invocation of the Fifth Amendment in response to actual or potential prosecution, namely statements accusatory of another taken by law enforcement personnel with a view to prosecution.[20]  Such statements have two characteristics that together make them inherently unreliable: (1) the declarant makes accusatory statements that inculpate another; and (2) these statements are made to nonundercover law-enforcement personnel after the commission of the offense.  In that generic situation there always exists the strong possibility that the declarant has the "desire to shift or spread blame, curry favor, avenge himself, or divert attention to another."  *Lee*, 106 S.Ct. at

---

[20]     It appears that this Court might have already reached such a conclusion in *Sarmiento-Perez*.  There, we held that "the custodial confession of an unavailable declarant lacks those indicia of reliability that would render it admissible in evidence against a criminal defendant within the hearsay exception provided by Rule of Evidence 804(b)(3)."  633 F.2d at 1104.    Moreover, at least one respected treatise has interpreted *Sarmiento-Perez* as holding "that the fact of custody alone, with its attendant likelihood of motivation by a desire to curry favor with the authorities, bars a finding that the statement was against interest and requires exclusion."  E. Cleary, *supra*, § 279 p. 826.  However, *Sarmiento-Perez's* broad language was ignored by the *Vernor* court, which chose to interpret that decision as merely requiring a case-by-case assessment of such statements.  *Vernor*, 902 F.2d at 1187-88.

2064.  It is precisely in these circumstances that cross-examination, the "greatest legal engine ever invented for the discovery of truth," *see* 5 Wigmore, *supra*, § 1367 p. 32, is preeminently suited to determining the trustworthiness of a declarant's statements as envisioned by the framers of the Confrontation Clause.

The Confrontation Clause reflects "the ancient faith of the common law, incorporated by the founders in the Bill of Rights, that live confrontation and cross-examination of witnesses in the courtroom is the key to finding the truth in a criminal trial." *Gomez-Lemos*, 939 F.2d at 333.  As noted by the concurrence in *Gomez-Lemos*, "The framers of our Constitution were well aware of England's unhappy experience with Star Chamber procedures, and the Sixth Amendment was designed, in part, to forbid the use of the most objectionable of these procedures in the criminal courts of the United States."  *Id.* at 334 (Nelson, J., concurring).  Such objectionable procedures included sworn *ex parte* depositions used against defendants in criminal cases.  Coke, Fourth Institute, Chapters 5 and 64.  The Confrontation Clause was developed to "prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness." *Mattox*, 15 S.Ct. at 339; *see also California v. Green*, 90 S.Ct. 1930 at 1934 (1970); *White v. Illinois*, 112 S.Ct. 736, 746 (1992) (Thomas, J., dissenting).[21]

---

[21]    Justice Thomas argued that preventing "trial by affidavit" was, from an historical perspective, both the core purpose and

The hearsay rules operate in civil as well as criminal proceedings, and may be invoked by the government as well as by the citizen. But the Confrontation Clause applies only in criminal prosecutions and protects only the accused. Its "lineage . . . traces back to the beginnings of Western legal culture." *Coy v. Iowa*, 108 S.Ct. 2798 at 2800 (1988). Moreover, "'the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact,'" *Maryland v. Craig*, 110 S.Ct. 3157, 3162 (1990) (quoting *Coy*, 108 S.Ct. at 2800), "witnesses who confront him at trial, upon whom he can look while being tried." *Coy* at 2801. The purpose of confrontation is not *solely* a function of conventionally explainable enhanced reliability, for in this respect the clause "serves ends related both to appearances and to reality," *Coy* at 2801, has a "strong symbolic purpose," and responds to "'something deep in human nature that regards face-to-face confrontation between accused and accuser as "essential to a fair trial in a criminal prosecution."'" *Craig* at 3164 (quoting *Coy* at 2800, quoting *Pointer v. Texas*, 85 S.Ct. 1065, 1068 (1965)).[22]

the furthermost extent of the protection provided by the Confrontation Clause, and that the Confrontation Clause should not require exclusion of dissimilar sorts of hearsay, whether or not within a "fairly rooted" exception to the hearsay rule. Justice Thomas would hold that the "Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Id.* at 747. This view, so far as it would *narrow* the protections of the Confrontation Clause, was rejected by the Court in *White*.

[22]    Although *Craig* notes that "the face-to-face confrontation requirement is not absolute" and may be modified "where . . .

The use of *ex parte* depositions is still barred in criminal proceedings. Depositions may only be taken for a criminal trial if notice is given to all parties, the defendant is given an opportunity to be present personally and through counsel at the examination, and the scope and manner of examination and cross-examination are the same as would be allowed at the trial itself. Fed. R. Crim. P. 15. However, under *Vernor*, the substantial equivalent of an *ex parte* deposition may be taken, and used at trial against a defendant, where the prosecutor procures a declarant's grand jury testimony with an eye towards the later joint prosecution of the defendant and/or the declarant. In the case *sub judice*, Navarro's grand jury testimony, derived *ex parte* and without the benefit of counsel for either himself or Flores, comes perilously close to resembling England's Star Chamber proceedings. The government's choice of trying Navarro jointly with Flores in essence guaranteed that Navarro would be unavailable because he would invoke his Fifth Amendment privilege. The government, in effect, created its own unavailable declarant.[23] The district court allowed this testimony into evidence against both

---

necessary to further an important public policy and . . . the reliability of the testimony is otherwise assured," nevertheless in sustaining the modification there at issue *Craig* stressed that "the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." *Id*. at 3166. *Craig* also reflects that under the there challenged procedure, the witness's testimony was given in personal face-to-face confrontation with defendant's counsel. *Id*. at 3161.

[23]    We recognize that it likely may do so for purposes of unavailability as defined in Rule 804(a)(1). But, here we deal with the Confrontation Clause. *See Wright* at 3146.

24

defendants because it adversely implicated Navarro's penal interest and the district court was satisfied with its trustworthiness. However, in the area of codefendants' confessions to law enforcement authorities that implicate another, this should rarelySQif everSQbe the case due, among other things, to their inherent unreliability. *Lee*, 106 S.Ct. at 2062.

The Supreme Court has never allowed the admission against a defendant of a codefendant's hearsay inculpatory statements to law enforcement authorities, although it has suggested that theoretically such hearsay could be admitted in appropriate circumstances. *Cruz v. New York*, 107 S.Ct. 1714, 1719 (1987); *Lee*, at 2065. But that suggestion should not drive us to allow a codefendant's confession to law enforcement authorities to be admitted against the defendant merely because the district court is able to fairly recite a litany of factors and conclude that the particular confession has "sufficient indicia of reliability." In *Vernor*, the factors surrounding the making of the statement that were relied on to demonstrate its trustworthiness were: (1) the declarant took, without attempting to minimize, full responsibility for his role in the offense; (2) nothing indicated that the declarant made the statements to avenge himself or to curry favor with the authorities; (3) the authorities who procured the statements testified and were cross-examined at trial concerning the circumstances and contents of the statements; (4) no promises or plea bargains were made with the declarant; (5) the statements were made voluntarily; (6) the declarant was fully informed of his *Miranda* rights; and (7) the offense was still fresh in the

25

declarant's mind.    902 F.2d at 1188.[24]

While the presence of these factors (as opposed to their opposites) doubtless renders a given confession more reliable than it would otherwise be, we are not persuaded that it substantially eliminates any reasonable possibility that the third party inculpatory portions of a confession to law enforcement personnel are unreliable.    As to the first factor, a declarant must incriminate himself in order to fit within the exception in the first place.   Whether such incriminating statements describe the declarants' full role in the offense will rarely be determined from the confession alone.  Taking on the full blame for a minor role in an offense, such as claiming to be a mere courier in a drug conspiracy, does little to demonstrate trustworthiness because the declarant still has the motive to shift the blame to others so as to receive a lesser penalty.   In certain instances this concern might be resolved by other evidence, but *Wright* does not allow such evidence to be considered.  The second factor views the *absence* of evidence showing improper motives as indicating trustworthiness. However, statements by suspects to law enforcement officials inculpatory of third parties are excluded because of the *presumption* that such motives exist, and the absence of evidence does not remove this presumption.   *Lee*, 106 S.Ct. at 2064.   The third and fourth factors, though helpful in tending to indicate that the statements are not made in response to prior express

---

[24]    As previously observed (see note 16, *supra,* and accompanying text), *Vernor* also relied, in its ultimate assessment of the trustworthiness of the statement, on external corroborating evidence.

26

inducements such as a plea bargain or other promise, do little to show that the declarant does not desire to curry favor with the authorities in the perhaps mistaken hope that he will receive some favorable consideration.[25] Nor do they tend to negate a motive to avenge.  The fifth and sixth factors, that the declarant made the statements voluntarily and with *Miranda* warnings, will generally be present when a confession is taken, and were present in *Lee*.  The *Lee* court gave them no weight because they do not bear on whether the declarant's confession was free of the motive to mitigate the declarant's role in the offense.  *Lee*, 106 S.Ct. at 2064.  The last factor, making the confession shortly after the offense, does little to illuminate the declarant's motive.

If one suspected of a particular offense confesses to the investigating authorities and implicates others, under the above-referenced *Vernor* factors that confession, including its accusations against the others, could generally be admitted as substantive evidence against all in a joint trial.  In that context, the combined expansion of two generally benign evidentiary conceptsSQunavailability and declarations against interestSQresults in sanctioning evidence that has historically been viewed as generically suspect and violative of values at the very core of the

---

[25]    As noted in *Gomez-Lemos*, the *presence* of a plea agreement, even after the defendant has been convicted, also would not serve as an indicia of trustworthiness because the declarant would have a strong desire to curry favor with the government and divert attention to another in the "hopes that the government will make favorable recommendations to the sentencing judge."  939 F.2d at 333.  Even after sentencing, these motives may exist because "the government still possesses influence regarding the security level and location of the prison where the [declarant] is to be incarcerated."  *Id.*

Confrontation Clause. Where the government has the means to procure the declarant's trial testimony,[26] the fact that there will often be "significant costs" (*see Lee* at 2067, Blackmun J., dissenting) in its doing so should not override one of our oldest and strongest legal traditions and the very essence of the Confrontation Clause, namely the protection against conviction on the basis of third party accusations made in *ex parte* confessions to law enforcement or prosecutorial authorities, where there is no opportunity for the defendant to cross-examine and personally confrontSQor for the trier of fact to observeSQthe declarant.[27]

## Conclusion

We hold that the district court's admission of Navarro's grand jury testimony as substantive evidence against Flores, over Flores' objection, violated Flores' rights under the Confrontation Clause.

Although the question is a very close one and not free from doubt, we are also unable to conclude that this error was harmless.

Accordingly, Flores' conviction is reversed and the cause is

---

[26] And the declarant's trial silence is not procured by the defense. *See Gomez-Lemos*, 939 F.2d at 334 n.3; *Thevis*, 665 F.2d at 632-33.

[27] Our approach in instances fitting within this classification is general and categorical, rather than calling for or being dependent on a case-by-case examination and weighing of particular factors or circumstances surrounding the statement and the declarant (either those of *Vernor* or otherwise). The old saw has it that lawyers and judges "never say never." Pending further guidance from the Supreme Court, we do not presently have occasion to pass on whether there might ever be some extremely unusual case within this genre where the trustworthiness of the statement (grand jury testimony or the like) and the "costs" of procuring the declarant's testimony are both so extraordinarily high that, when viewed together with other special circumstances, consideration of a possible exception to the general rule of inadmissibility might be warranted.

28

remanded for a new trial.

REVERSED and REMANDED