688 So.2d 552 (1996)
STATE of Louisiana, Appellee
v.
Umekia Deon KIMBLE, Appellant.
No. 27960-KA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1996.
Opinion on Rehearing September 3, 1996.
*553 Indigent Defender Board by Ford E. Stinson, for Appellant.
Richard Ieyoub, Attorney General, James Bullers, District Attorney, and Whitley Graves, Assistant District Attorney, for Appellee.
Before SEXTON, HIGHTOWER and STEWART, JJ.
HIGHTOWER, Judge.
After a jury found Umekia Deon Kimble guilty of two counts of armed robbery, La. R.S. 14:64, and two counts of second degree kidnapping, La.R.S. 14:44.1, the trial judge sentenced her to a total of fifteen years at hard labor. She now appeals her convictions and punishment. We affirm.

*554 FACTS
Late on the evening of December 30, 1993, Sean Moch and Tyrone Gilliam went to the Motel 6 in Bossier City, having been invited there by two young women, Zelwannica Coleman and defendant, for the purported purpose of consuming alcohol and drugs and engaging in sexual intercourse. At first, all four individuals gathered in Kimble's downstairs room. Shortly after defendant received a phone call, however, Gilliam and Coleman left to go to a second floor room, leaving the other two occupants alone.
Outside, several armed men in ski-masks confronted Gilliam and Coleman, took the couple to the upstairs room, and bound them with duct tape. Some of the assailants then taped Gilliam's eyes and removed him to a waiting vehicle, while directing other malefactors to go downstairs to get Moch. During a thirty-five to forty minute automobile ride, the kidnappers continually asked Gilliam about drugs they believed he possessed at another location, threatened and beat him, and eventually robbed him of $300 cash. Finally, the men put Gilliam out of the car, telling him to walk straight ahead to the door of a nearby house while they escaped. His ordeal ended when the police, called by the residents of the home, freed Gilliam from his bonds.
Immediately after Gilliam's abduction, defendant responded to a phone call from Coleman requesting that she come upstairs. Upon her exit, at least two hooded men burst into the room and abducted Moch at gunpoint. Before removing him from the motel to the back seat of a vehicle, they used tape to bind his hands, eyes, and mouth, and then robbed him of $200 to $300, in addition to his car keys. When his abductors demanded drugs from a Shreveport residence where they thought he distributed controlled dangerous substances, Moch stated he had cocaine at that address. Arriving there, the abductee persuaded the culprits to unbind him. Upon going into the house, however, he immediately slammed the door and blocked further entry. His former captors then quickly fired two shots into the entrance and fled.
In the early morning hours, the Bossier City Police Department began investigating the abductions and robberies. In one of the motel rooms, officers found duct tape and evidence of a scuffle. Both robbery victims had duct tape residue about their persons and exhibited signs of having been physically attacked. After eventually learning the women had been criminally involved in the episode, authorities arrested Coleman on January 3, 1994.
About a week later, Detective Dwayne Presley allowed Coleman's aunt to visit with her niece at the police department. Following this short meeting, the incarcerated woman gave the investigator a statement concerning the events in question. After an advisement and waiver of her rights, she admitted that she and Kimble had been "the bait" to lure Moch and Gilliam from their suspected Shreveport "drug house" so that it could be burglarized of money and drugs. With the discovery of other people at the targeted residence, however, the initial plan fell through, necessitating another scheme that entailed kidnapping and robbery. Several days after giving her recorded statement, Coleman, the mother of four children and pregnant with a fifth, gained release on her own recognizance. Some three or four days later, she fell victim to a homicide subsequently linked to a cousin of one of her coconspirators.
Coleman's confession resulted in four persons, viz., Adrian Dewayne Anderson, Broderick T. Collins, Brian Keith Powell, and Kimble, being charged in the kidnappings and robberies. When these individuals sought to suppress the statement on grounds it had been obtained in violation of Coleman's constitutional right to representation, the district judge found that they lacked standing to make such a challenge. By means of a motion in limine, the alleged conspirators then urged a hearsay objection; however, the trial court ruled the statement to be against the declarant's penal interest and, with her obviously unable to testify, admissible under La. C.E. Art. 804(B)(3). Thereafter, in one trial, the state presented two counts of kidnapping and two counts of armed robbery against each of the defendants.
*555 The jury heard testimony from the two victims and the investigating officers, together with Coleman's confession. Both Moch and Gilliam specifically identified Kimble, in court, as being with them at the motel on the night of their abduction. Regarding defendant's direct involvement in the alleged conspiracy, Coleman's statement specifically stated that both she and Kimble willingly participated in the plan to lure the two men, believed to be drug dealers, to the hotel. She also revealed the other defendants' involvement in the actual abductions and robberies, Powell's role as the mastermind, and the fact that Kimble rented one room while Anderson provided the other key. The state further introduced a signed receipt showing defendant paid for Room 128 at the motel. Coleman's admission additionally explained that, although she had initially been bound in order for her to appear to be a victim, the tape had deliberately been left loose to facilitate her escape and subsequent telephone call requesting that defendant leave the other room.
After the jury found all four codefendants guilty as charged,[1] Kimble received five years at hard labor on each conviction. Mandatorily, the terms imposed for armed robbery and two years as to each second degree kidnapping will be served without benefit of parole, probation, or suspension of sentence. In addition, the trial judge ordered that the incarceration on the final kidnapping count be served concurrently with the other three sentences, which will run consecutively to each other. After the denial of a motion for reconsideration, Kimble appealed.[2]

DISCUSSION

Admissibility of Deceased Conspirator's Confession
In her first briefed assignment of error, Kimble challenges on several grounds the admissibility of her deceased co-conspirator's confession.

A.
Initially contending that the trial court wrongly denied her motion to suppress, defendant asserts that the police obtained the statement in violation of Coleman's right to counsel under the Sixth Amendment of the United States Constitution and Article 1, Section 13 of the Louisiana Constitution. Specifically, based upon State v. Hattaway, 621 So.2d 796 (La.1993), it is argued that the state overstepped Coleman's constitutional guarantees when, after the appointment of a public defender, officers interviewed her without first contacting that attorney. We disagree.
Although the trial court rejected Kimble's motion after concluding she lacked standing to insist upon Coleman's right to counsel, we need not address the soundness of that ruling.[3] Even if we assume such standing, no constitutional violation occurred. In a recent partial overruling of Hattaway, the Louisiana Supreme Court held that during an interrogation a defendant may validly waive his previously attaching, but unasserted or uninvoked, federal and state constitutional right to counsel. See State v. Carter, 94-2859 (La. 11/27/95), 664 So.2d 367.
The present record does not show that Coleman ever asserted her right to counsel, but, instead, clearly indicates she initiated the discussion with the police after conversing with her aunt. Moreover, Coleman continued in her desire to make a statement, even after being read a Miranda warning by the detective. Thus, the state adequately proved that she waived her right to counsel *556 in a knowing, intelligent, and voluntary manner.

B.
Kimble also maintains that the trial court erred in denying the motion in limine directed at Coleman's statement. In heavy reliance upon Williamson v. U.S., 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), defendant contends that the confession constituted inadmissible hearsay, as well as violated her constitutional right of confrontation.
The first question faced in this regard is whether, under the hearsay exception within La.C.E. Art. 804(B)(3), the custodial statement of a deceased accomplice may be admitted against an accused as a statement against the confessor's penal interest. Because the Louisiana rule closely parallels Fed.R.Evid. 804(b)(3), federal jurisprudence can assist in resolving the issue. See State v. Coates, 27,287 (La.App. 2d Cir. 09/27/95), 661 So.2d 571. Indeed, where a defendant has been implicated by such a statement, our state courts have been directed to the discussion of the federal rule in Williamson, supra. See State v. Smith, 94-1221 (La. 10/07/94), 643 So.2d 1221.
Recognizing the strong motivation to implicate another and exonerate oneself, the Williamson court deemed custodial statements about another's actions to be generally less credible than ordinary hearsay. See also Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). That pronouncement, however, does not indicate that Rule 804(b)(3) precludes admission of all statements wherein an accomplice implicates an accused.[4] Instead, the opinion explains that "[e]ven the confession of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor." Williamson, 512 U.S. at 603, 114 S.Ct. at 2436. By analogy then, in cases involving La.C.E. Art. 804(B)(3), the relevant question becomes whether the challenged statement is sufficiently against the declarant's penal interest that a reasonable person in that position would not have made the statement unless believing it to be true. Id., at 603-05, 114 S.Ct. at 2437. Such an inquiry can only be answered in light of the total circumstances, including those surrounding the criminal activity involved. Id.
In the case sub judice, Coleman had the opportunity to meet in private with her maternal aunt, Deborah Johnson, immediately prior to talking to the detective. During the conversation with her closest living relative in the Shreveport area, Coleman detailed the planning and commission of the crime, including the parts played by herself, defendant, and the others. When made in a noninvestigatory context, where the setting indicates no motive to speak falsely, statements against penal interest and confessions to personal acquaintances or family members suggest reliability, even when adversely implicating others. See U.S. v. Flores, 985 F.2d 770 (5th Cir.1993). What Johnson later recited at the motion to suppress, concerning her niece's statement, is generally indistinguishable from what Coleman told the detective. Assuring the declarant she could tell her the truth, the aunt had stated she would do her best to be of assistance. Johnson also denied inferring, during their discussion, that Coleman could gain any advantage from the authorities. In fact, she acknowledged that Detective Presley had initially been reluctant to arrange the conference.
In her statement to Detective Presley as well as to her aunt, Coleman disclosed that the nefarious plot had been discussed at her residence with both young women present. Although Coleman's boyfriend, Powell, devised the scheme to rob the victims of money and drugs, she and Kimble willingly agreed to lure the men away from the suspected drug house in order for it to be burglarized, and, as matters later developed, to facilitate the kidnappings and robberies. In addition to admitting her complicity, she directly acknowledged an awareness that the planned actions violated the law. While indicating that the male perpetrators had the most *557 involvement, she never placed more blame on her cohort, Kimble, than on herself. Each statement in that regard is generally stated in terms of "me and Kimble." In point of fact, by confessing that she phoned defendant to get her out of the downstairs room so that Moch could be accosted, she implicated herself more deeply than an individual merely following direct orders.
Beyond all that, Coleman's taped statement correlates with the other evidence presented at trial. Unquestionably, both victims placed Kimble and her now-deceased accomplice at the hotel when the assaults and kidnappings began. Moch even noted that defendant quite conveniently left the room an instant before the men forced their way inside. Also, the introduced motel receipt verifies Coleman's assertion that defendant actually rented one of the rooms utilized in setting the trap.
Reviewing the entire circumstances, we find Coleman's statements to the police to be sufficiently against her penal interest that a reasonable person in her position would not have made them unless believing them to be true. As such, they are genuinely self-inculpatory in nature. Importantly too, none of the statements relative to Kimble's involvement appear to stem from an effort to shift or spread blame, curry favor, avenge oneself, or divert attention to another. Accordingly, the trial court correctly held the confession to be trustworthy and reliable and, thus, admissible under the hearsay exception of La.C.E. Art. 804(B)(3) and the dictates of Williamson.
Although Williamson can be read to warn against the in globo introduction of inculpatory confessions which implicate others, we would not view such a general interpretation to be controlling in the case against Kimble. Any portions of the present statement that might not qualify as truly self-inculpatory concern events beyond defendant's actual involvement, and do not further implicate her. To the extent that references are made to acts committed by other confederates and duplicate occurrences already related to the jury by the victims, we find the admission of these to be harmless. See La.C.Cr.P. Art. 921; State v. Coates, supra.[5]
Defendant additionally contends that the admission of the statement into evidence contravenes her right to confront and cross-examine adverse witnesses as guaranteed by the Sixth Amendment of the United States Constitution and Article 1, Section 16 of the Louisiana Constitution. We again disagree. In Williamson, although choosing not to address this issue directly, the prevailing justices observed that the very fact that a statement is genuinely self-inculpatory is, itself, one of the "particularized guarantees of trustworthiness" affording admissibility under the Confrontation Clause. Williamson, 512 U.S. at 605, 114 S.Ct. at 2437. See also Lee, supra. Thus, having previously determined Coleman's confession to be self-inculpatory, we discern no constitutional infringement. What is more, upon examining the total circumstances surrounding Coleman's statement, particularly her prior admissions to her aunt, the declarant emerges particularly worthy of belief. See Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); U.S. v. Flores, supra. This is especially cogent where, as in this case, the state has no means of procuring the declarant's testimony and, indeed, may have been precluded from doing so by the actions of one of the conspirators.[6] See generally U.S. v. Flores, supra.
*558 In sum, then, we find no merit in Kimble's complaints regarding the admission of Coleman's taped statements into evidence.

Excessive Sentence
In her last assignment of error, Kimble contends that the lower court both imposed a constitutionally excessive sentence and erred in not following the recommendation of the Louisiana Felony Sentencing Guidelines.
Although it must consider the guidelines, the trial court has complete discretion to reject those standards and impose any sentence which is within the statutory range of the applicable crime and not constitutionally excessive. State v. Smith, 93-0402 (La. 07/05/94), 639 So.2d 237. The district judge need only state the considerations taken into account and the factual basis for the sentence imposed. La.C.Cr.P. Art. 894.1; Id. When such compliance occurs, our review is limited to constitutional excessiveness. State v. Smith, supra.
The present record reflects a fully articulated factual basis for the sentence. Although Kimble's minor participation in the crimes and her previous successful completion of juvenile probation resulted in the statutory minimum five-year term being imposed for each of the four offenses, the trial judge found adequate reason to run the first three periods of incarceration consecutively. In that regard, the court noted the serious nature of the criminal acts involved, the "strong possibility" that Coleman had been killed because she gave a statement implicating her accomplices, the judge's direct observation of threats (made in the court hallway) by Kimble's family and associates toward Coleman's aunt, threats against another witness resulting in her fate and whereabouts being unknown, and the relationship of the crime to drugs in that one band of dealers tried to steal the cache of another group.
It is well within a trial court's discretion to run sentences consecutively rather than concurrently. State v. Coates, supra; State v. Smith, 26,661 (La.App. 2d Cir. 03/01/95), 651 So.2d 890, writ denied. Concurrent sentences are not mandatory, nor are consecutive sentences necessarily excessive simply because two convictions stem from the same course of conduct. State v. Ortego, 382 So.2d 921 (La.1980), cert. denied; State v. Coates, supra; State v. Lighten, 516 So.2d 1266 (La. App. 2d Cir.1987); see also La.C.Cr.P. Art. 883; La.S.G. § 215. When imposing concurrent sentences, the trial court need only state for the record the factors considered and reasons justifying such action. State v. Smith, supra; State v. Lighten, supra. Reviewing the entire record and considering the previously mentioned factors, we find the district judge adequately justified the decreed punishment.
As the trial court articulated an adequate factual basis for the sentence, we limit further review to the question of constitutional excessiveness. See State v. Smith, supra. For a discussion of the parameters applied in that determination, see La. Const. Art. I, § 20; State v. Lobato, 603 So.2d 739 (La. 1992); State v. Barberousse, 480 So.2d 273 (La.1985); State v. Square, 433 So.2d 104 (La.1983); State v. Bonanno, 384 So.2d 355 (La.1980). In that connection, considering the present circumstances in their totality and the serious nature of the acts committed, we conclude that Kimble's combined fifteen-year sentence is not excessive.

Error PatentCredit for Time Served
Our review of the record does not reveal any credit accorded for time served. The provisions of La.C.Cr.P. Art. 880 require that the trial judge thus ascribe such periods in actual custody, and failure to do so constitutes error patent. State v. Coleman, 605 So.2d 231 (La.App. 2d Cir.1992); State v. Hughes, 587 So.2d 31 (La.App. 2d Cir.1991), writ denied; State v. Allen, 571 So.2d 758 (La.App. 2d Cir.1990). Accordingly, the sentences will be amended to reflect any time in actual custody, as a result of these offenses, which has not been calculated against any other term of incarceration. Cf. State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied.

CONCLUSION
We affirm for these reasons both the convictions and, after amendment as indicated, the sentences.
*559 CONVICTIONS AFFIRMED; SENTENCE AMENDED AND AFFIRMED.
STEWART, J., dissents with reasons.
STEWART, Judge, dissenting.
For the following reasons, I must respectfully dissent from the conclusions of the majority regarding the admissibility of Zelwannica Coleman's confession.
First, I disagree with the majority's interpretation of the United States Supreme Court's decision in Williamson v. U.S., 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). In that case, the declarant, Harris, made certain statements to DEA initially inculpating himself, Williamson, and an unknown Cuban in Florida. He later recanted that story and offered another one excluding the Cuban as fabrication, exculpating himself, and inculpating the accused, Williamson. The government sought to introduce Harris' confessions into evidence against Williamson as statements against the declarant's interest, an exception to the hearsay rule, pursuant to Fed.R.Evid. 804(b)(3), because the declarant refused to testify, despite offers of immunity and the threat of contempt charges. The Supreme Court vacated and remanded the case to federal district court.
For the majority, Justice O'Conner carefully explained why such statements by a declarant should be suspect:
Rule 804(b)(3) is founded on the commonsense notion that reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true. This notion simply does not extend to the broader definition of "statement." The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature. (Emphasis added.)
In this respect, it is telling that the nonself-inculpatory things Harris said in his first statement actually proved to be false, as Harris himself admitted during the second interrogation. And when part of the confession is actually self-exculpatory, the generalization on which Rule 804(b)(3) is founded becomes even less applicable. Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.
Id. at 599-600, 114 S.Ct. at 2435.
The Court further states:
"The arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence."
Id. (Citations omitted.) However, the Court points out there are many instances in which the confessions of arrested accomplices have been admitted, but they must be truly self-inculpatory, rather than merely attempts to shift blame or curry favor. Id. at 603-05, 114 S.Ct. at 2437.
In the instant case, although Coleman shares the blame with Kimble in her statements, it is clear that by stating that both were participants in the scheme, she garners favor for herself with the police because she stepped forward and implicated all of the others. Moreover, the declarant, who was charged with two counts of armed robbery, two counts of kidnapping, and was being held on a $100,000.00 bond, curried some level of favor for herself as a result of her confession, because after confessing, she was released from jail on her own recognizance. This fact is conspicuously absent from the majority's "fact-intensive" analysis of all of the surrounding circumstances.
Rather than performing the Williamson fact-intensive inquiry, which requires careful examination of all the circumstances, the majority assumes Coleman's statements regarding Kimble to be true and builds its decision around those statements. However, excluding Coleman's self-serving references to Kimble, the only evidence implicating Kimble *560 is her mere presence in the motel with a young man and her unauthenticated signature on the motel receipt. This evidence coupled with the confession of a young woman, who was more concerned about exculpating herself, is, in my opinion, sufficient to render the confession, as far as it implicates Kimble, inadmissible.
Next, the majority fails to adequately address the defendant's contention that the admission of Coleman's statement violates Kimble's right to confront and to cross-examine adverse witnesses, as guaranteed by the Sixth Amendment of the United States Constitution and Art. 1, Sec. 16 of the Louisiana Constitution. The majority simply adopted the stance taken by the Supreme Court in Williamson and concluded that because the statement was sufficiently self-inculpating, it was admissible under the Confrontation Clause. I disagree.
Incriminating statements admissible under an exception to the hearsay rule are not admissible under the Confrontation Clause unless the statements bear adequate indicia of reliability. State v. Beason, 26,725 (La. App. 2d Cir. 4/7/95), 653 So.2d 1274, citing Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Reliability can be inferred, without more, in a case where the evidence falls within a firmly rooted hearsay exception. Id. However, the United States Court of Appeal for the Fifth Circuit in U.S. v. Flores, 985 F.2d 770 (5th Cir.1993), concluded that declarations against penal interest, when used to inculpate a codefendant, do not meet the Sixth Amendment test because they are inherently unreliable and because this exception is not firmly rooted as an exception to the hearsay rule.
Judge Garwood, writing for the majority, states:
The relatively recent recognition of declarations against penal interest as an exception to the hearsay rule by the Federal Rules of Evidence would seem to counsel against a headlong rush to broadly embrace the exception as providing a sufficient substitute for cross-examination and personal confrontation in cases of the present kind. We recognize that statements which adversely implicate the penal interest of the declarant alone for many years have been widely recognized as normally reliable and, where the declarant is unavailable, have usually been admitted in evidence in federal and most state courts. See E. Clearly, McCormick on Evidence § 278 (3d ed. 1984). Arguably, such statements may be deemed a "firmly rooted" exception to the hearsay rule under the Lee formulation.
It appears to us, however, that there is another category of statements against penal interest that should generally be regarded as inadmissible under the Confrontation Clause, ... namely statements accusatory of another taken by law enforcement personnel with a view to prosecution. Such statements have two characteristics that together make them inherently unreliable: (1) the declarant makes accusatory statements that inculpate another; and (2) these statements are made to nonundercover law-enforcement personnel after the commission of the offense. In that generic situation there always exists the strong possibility that the declarant has the "desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." Lee, 476 U.S. at 545, 106 S.Ct. at 2064. It is precisely in these circumstances that cross-examination, the "greatest legal engine ever invented for the discovery of truth," see Wigmore, supra, § 1367 p. 32, is preeminently suited to determining the trustworthiness of a declarant's statements as envisioned by the framers of the Confrontation Clause.
Flores, supra, at 780-81.
In this case, the statements made by Coleman are inherently suspect. Coleman had every reason to fabricate her story to the police about Kimble's participation in the plot, because she feared almost certain prosecution. Similarly, there is no heightened credibility to Coleman's statement merely because she told her aunt the same story that she told the police. Admitting anything other than minimal participation in the scheme could have resulted in potential abandonment by her family.
*561 Further, the fundamental requirements of the Sixth Amendmentthe right to face-to-face confrontation and the right to cross-examine the declarantare absent because of Coleman's untimely demise. Consequently, it is inconceivable that absent these requirements to determine reliability and credibility, such a damaging statement by a deceased codefendant can be admitted against the defendant.
If Coleman had testified at trial, the jury would have been instructed to treat her testimony with great caution. State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989). Obviously, if after confrontation and cross-examination by the defendant, the declarant's testimony is still suspect, certainly the introduction of any prior statements alone, without the Sixth Amendment protections, is inherently unreliable. However, taking the majority's reasoning to its logical conclusion, prosecutors would best be served by making certain witnesses "disappear." Introducing their statements would certainly be easier in such case.
For the reasons articulated, I would vacate the conviction and sentence and remand the matter for a new trial consistent with the holdings in Williamson and Flores. Respectfully, I must dissent.
Before SEXTON, HIGHTOWER, BROWN, STEWART and CARAWAY, JJ.

ON REHEARING
STEWART, Judge, On Rehearing.
A jury found Umekia Kimble guilty on two counts of armed robbery, LSA-R.S. 14:64, and two counts of second degree kidnaping, LSA-R.S. 14:44.1. The trial court sentenced Umekia Kimble to a total of fifteen years at hard labor. She now appeals her convictions and sentence. For the foregoing reasons, we vacate the sentence and remand the matter for a new trial.

FACTS
On the evening of December 30, 1993, Sean Moch and Tyrone Gilliam went to the Motel 6 in Bossier City. They had been invited to the motel by two young women, Zelwannica Coleman and the defendant. At first, the four gathered in Kimble's downstairs room, after Kimble received a call, Gilliam and Coleman left to go to a room on the second floor, leaving Moch and Kimble alone.
When Gilliam and Coleman left the room, four men armed in ski-masks confronted them. The couple was taken to the upstairs room, and bound with duct tape. Gilliam's eyes were taped, and the assailants moved him to a waiting vehicle. During the following thirty-five to forty-minute automobile ride, the kidnappers continually harassed Gilliam about drugs they believed he possessed at another location. The assailants threatened, beat, and eventually robbed Gilliam of $300 cash. Eventually, after Gilliam was put out of the car he was held in, and told to walk straight ahead to a doorway, he rang its doorbell and was released. Ms. Coleman, according to her statement, was loosely bound, and quickly freed herself.
Immediately after Gilliam was abducted, Coleman called the defendant and requested that she come upstairs. When she exited the room, several armed men entered the room and abducted Moch at gunpoint. Before leaving the motel room, his hands, eyes, and mouth were bound with tape he was then robbed of $200 to $300, and his car keys. In response to his kidnappers' demands, Moch told them he had cocaine at a Doris Street address, and they took him there. Moch convinced the assailants to unbind him so that he could obtain entry to the house. He went to the door, opened it, and jumped inside, slamming the door shut and throwing his body to the floor in front of it. The former captors fired two shots through the doorway and fled.
The Bossier City Police Department began investigating shortly after the abductions and robberies were reported to them. In one of the motel rooms, officers found duct tape and evidence of a scuffle. Both robbery victims had a duct tape residue about their persons and exhibited signs of having been physically attacked. After eventually learning the women had been involved in the criminal event, authorities arrested Coleman and Kimble January 3, 1994. Both defendants, in *562 statements to the detectives, denied any involvement in the crime.
Several days later, Detective Dwayne Presley allowed Coleman's aunt Deborah Johnson to visit with her niece at the police department. Following this short meeting, Coleman requested to speak to the police. After advisement and waiver of her rights, Ms. Coleman admitted her involvement in being "the bait" in a trap. Originally, she stated that she and Kimble, were to lure Moch and Gilliam away from their suspected "drug house" so that it could be burglarized for drugs and money. However, after that plan failed the two women set the men up for abduction and robbery. After giving her recorded statement, Coleman was released on her own recognizance. Several days later, Coleman, the mother of four children and pregnant with a fifth, fell victim to a homicide.
Zelwannica Coleman's confession resulted in four persons being charged in the kidnaping and robberies: Adrian Dewayne Anderson, Broderick T. Collins, Brian Keith Powell, and the defendant. Each of the defendants sought to suppress the statement on the grounds that it had been obtained in violation of Coleman's constitutional right to representation. The trial court found that they lacked standing to make such a challenge. During a motion in limine, the four urged a hearsay objection. The trial court ruled that the statements were against the declarant's penal interest, and with her inability to testify, admissible under LSA-C.E. 804(B)(3). Thereafter, in one trial, the state presented two counts of kidnaping and two counts of armed robbery against each of the defendants.
The jury heard the testimony of the two victims, the investigating officers, and Coleman's confession. The two victims identified Kimble in court, as with them at the motel on the night of their abduction. Coleman specifically stated that both she and Kimble were willing participants in the plan to lure the two men to the motel. In addition to identifying her part in the plan, Coleman's statement inculpated the other defendants relaying their involvement in the actual abductions and robberies. Powell served as the leader, and Kimble rented one room while Anderson provided the other key. The stated introduced a signed receipt showing that the defendant paid for Room 128 at the motel.
After the jury found the four co-defendants guilty as charged, Kimble received five years at hard labor on each conviction. On both counts of Armed Robbery, the defendant received a sentence of five years, without benefit of parole, probation, or suspension of sentence on each count, consecutive to each other. On the remaining two counts of Second Degree Kidnaping, she received a sentence of five years at hard labor, two years without benefit of parole, probation, or suspension of sentence. Each count was to be served consecutive to the Armed Robbery sentences and concurrent with the other kidnaping conviction. After denial of a motion for reconsideration, the defendant appealed.

DISCUSSION
On rehearing this court addresses two issues: 1) Whether the trial court erred in ruling that the statement of Zelwannica Coleman implicating the defendant was admissible as a hearsay exception. 2) Whether the trial court erred in ruling that the statement of Zelwannica Coleman implicating the defendant did not violate the defendant's constitutional right of confrontation.

Admissibility of Zelwannica Coleman's Confession
The defendant maintains that the trial court erred in denying the motion in limine directed at Coleman's statement. Kimble contends under Williamson v. U.S., 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), that Coleman's confession constituted inadmissible hearsay, and violated the defendant's constitutional right of confrontation.
Therefore, the question presented to this court is whether under the hearsay exception with LSA. C.E. Art. 804(B)(3), the custodial statement of a deceased accomplice may be admitted against an accused as a statement against the confessor's penal interest. The Louisiana rule closely parallels Fed.R.Evid. 804(b)(3) therefore, federal jurisprudence *563 can assist in resolving this issue. See State v. Coates, 27,287 (La.App. 2d Cir. 09/27/95), 661 So.2d 571. Where a defendant has been implicated by such a statement, our state courts have been directed to the discussion of the federal rule in Williamson, supra. See State v. Smith, 94-1221 (La. 10/07/94), 643 So.2d 1221.
On rehearing, this court follows the United States Supreme Court's decision in Williamson v. U.S., supra. In that case, Reginald Harris made statements to Drug Enforcement Administration Agents initially inculpating himself, Williamson, and an unknown Cuban in Florida. Harris later recanted that story and offered another version excluding the Cuban as a fabrication, exculpating himself, and inculpating the accused, Williamson. The declarant refused to testify, despite offers of immunity and the threat of contempt charges. The government sought to introduce Harris' confession into evidence against Williamson as statements against the declarant's interest, an exception to the hearsay rule, pursuant to Fed.R.Evid. 804(b)(3).
For the majority, Justice O'Connor carefully explained why such statements by a declarant should be suspect:
Rule 804(b)(3) is founded on the common sense notion that reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true. This notion simply does not extend to the broader definition of "statement." The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature (Emphasis added.)
In this respect, it is telling that the nonself-inculpatory things Harris said in his first statement actually proved to be false, as Harris admitted during the second interrogation. And when part of the confession is actually self-exculpatory, the generalization on which Rule 804(b)(3) is founded becomes even less applicable. Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.
Williamson, supra, at 599-600, 114 S.Ct. at 2435.
The Court further states:
The arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.
Williamson, supra, (Citations omitted.) However, the Court points out there are many instances in which the confessions of arrested accomplices have been admitted, but they must be truly self-inculpatory, rather than merely attempts to shift blame or curry favor. Williamson, supra at 603-05, 114 S.Ct. at 2437. Therefore, the true question under the rule is whether the statement at issue was sufficiently against the declarant's penal interest under the rule's language. This question may only be answered after a review done in light of all the surrounding circumstances. Williamson, supra.
In the instant case, although Coleman shares the blame with Kimble in her statements, it is clear that by stating both were participants in the scheme, she garnered favor with the police. Statements which are truly self-inculpating are admissible. At issue are the statements which tend to inculpate Powell, Anderson, and Collins as the "big fish" in the enterprise, and both inculpate and exculpate Coleman and the defendant as the "little fish." The male defendants, whose identities as criminal actors in this event are not supported by any other evidence, are the ones most harmed by the statement. Coleman's statements led to the identification of the male participants. Those portions of the taped confession that implicate the others and subject Coleman to minimal criminal liability are those which cause this court difficulty. A reasonable person in Coleman's position would believe that by implicating others (Kimble, Powell, *564 Anderson and Collins) she would eliminate some of her exposure to criminal liability, "... at least as far as sentencing goes." The declarant, who was charged with two counts of armed robbery, two counts of kidnaping, and was being held on a $100,000.00 bond, obviously curried some level of favor for herself as a result of her confession. Soon after the confession, she was released from jail on her own recognizance.
Excluding Coleman's self-serving references to Kimble, the only evidence implicating Kimble is her presence and identification in the motel with a young man, and her unauthenticated signature on the motel receipt. This evidence coupled with the confession of a young woman, who was more concerned about exculpating herself, renders the confession, as far as it implicates Kimble, inadmissible.
In State v. Coates, 27,287 (La.App. 2d Cir. 9/27/95), 661 So.2d 571, this court conducted a Williamson inquiry. While in this instance this court found that the confession should not have been admitted and resulted in harmless error the court noted:
... Hall clearly implicated himself in the kidnaping but nonetheless attempted to tag Coates with the greater culpability. Hall's motivation is plainly suspect as he, along with others, was under arrest and charged with first degree murder when he gave the confession. Under the circumstances, Hall could have misrepresented or exaggerated Coates's role in the incident out of the very natural desire to carry favor from the arresting officers, the desire to alleviate culpability by implicating others, the enmity often generated in a conspiracy gone awry, or the desire for revenge ... In fact, Hall was ultimately allowed to plead guilty to manslaughter and second degree kidnaping. On this record, we conclude that Hall's confession as a whole is not sufficiently against his penal interest so as to be reliable under La.C.E. 804B(3) ...
Coates, supra at 581. Under the hearsay exception of LSA-C.E. Art. 804(B)(3), the custodial statement of the deceased accomplice, Zelwannica Coleman, was not sufficiently against her penal interest within the dictates of Williamson, supra so as to be reliable. Therefore, we conclude the trial court erred in admitting the confession of Zelwannica Coleman.
Second, the defendant contends that the admission of the statement into evidence violated her right to confront and cross-examine adverse witnesses as guaranteed by the Sixth Amendment of the United States Constitution and Article 1, Section 16 of the Louisiana Constitution.
Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, when the statement is being offered as an assertion to show the truth of matters asserted therein, and thus rests for its value upon the credibility of the out-of-court asserter. State v. Martin, 356 So.2d 1370, 1373-1374 (La.1978); LSA-C.E. art. 801(C). One of the primary justifications for the exclusion of hearsay is that the adversary had no opportunity to cross-examine the absent declarant to test the accuracy and completeness of the testimony. Also, the declarant is not under an oath at the time of the statement.
In Williamson, supra, the justices declined to address the issues, however, they did note "... the very fact that a statement is genuinely self-inculpatory ... is one of the `particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." See Lee, supra. Incriminating statements admissible under an exception to the hearsay rule are not admissible under the Confrontation Clause unless the statements bear adequate indicia of reliability. State v. Beason, 26,725 (La.App. 2d Cir. 4/7/95), 653 So.2d 1274, citing Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Reliability can be inferred, without more, in a case where the evidence falls within a firmly rooted hearsay exception. Beason, supra. However, the United States Court of Appeal for the Fifth Circuit in U.S. v. Flores, 985 F.2d 770 (5th Cir.1993), concluded that declarations against penal interest, when used to inculpate a codefendant, do not meet the Sixth Amendment test because they are inherently unreliable *565 and because this exception is not firmly rooted as an exception to the hearsay rule.
The majority provided:
The relatively recent recognition of declarations against penal interest as an exception to the hearsay rule by the Federal Rules of Evidence would seem to counsel against a headlong rush to broadly embrace the exception as providing a sufficient substitute for cross-examination and personal confrontation in cases of the present kind. We recognize that statements which adversely implicate the penal interest of the declarant alone for many years have been widely recognized as normally reliable and, where the declarant is unavailable, have usually been admitted in evidence in federal and most state courts. See E. Clearly, McCormick on Evidence § 278 (3d ed. 1984). Arguably, such statements may be deemed a "firmly rooted" exception to the hearsay rule under the Lee formulation.
It appears to us, however, that there is another category of statements against penal interest that should generally be regarded as inadmissible under the Confrontation Clause, ... namely statements accusatory of another taken by law enforcement personnel with a view to prosecution. Such statements have two characteristics that together make them inherently unreliable: (1) the declarant makes accusatory statements that inculpate another; and (2) these statements are made to nonundercover law-enforcement personnel after the commission of the offense. In that generic situation there always exists the strong possibility that the declarant has the "desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." Lee, 476 U.S. at 545, 106 S.Ct. at 2064. It is precisely in these circumstances that cross-examination, the "greatest legal engine ever invented for the discovery of truth," see Wigmore, supra, § 1367 p. 32, is preeminently suited to determine the trustworthiness of a declarant's statements as envisioned by the framers of the Confrontation Clause.
Flores, supra, at 780-81.
In this case, the statements Coleman made are inherently suspect. Fearing almost certain prosecution, she had every reason to fabricate her story to the police about the codefendant's participation. There is no heightened credibility to Coleman's statement merely because she told her aunt the same story that she told the police. Coleman may have felt familial pressure to minimize her involvement in her statements to her aunt.
The right of confrontation means more than simply physically confronting a witness. Implicit within the meaning of confrontation is a face-to-face meeting and the right to cross-examine the declarant. Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. State v. Lindsey, 621 So.2d 618 (La.App. 2d Cir.1993). Both are absent due to Coleman's untimely demise.
In State v. Sherman, 630 So.2d 321 (La. App. 5th Cir.1993), the court provided several factors readily accessible to the reviewing court to determine whether the error was harmless beyond a reasonable doubt. These factors include "... the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the overall strength of the prosecution's case." Sherman, supra, at 324-25.
Clearly, the prosecution's case was dependent on the declarant's statement. The defendant was unable to cross-examine Coleman concerning her credibility, or motivation for making this statement. Coleman's statement was not cumulative, nor corroborated by other testimony. Rather, Kimble's inability to cross-examine Coleman concerning any favor she may have garnered violated the defendant's right to confront her accuser under the Sixth Amendment to the United States Constitution.
*566 None of the methods by which the courts guarantee the relationship between the Confrontation Clause and hearsay evidence are present. There was no oathinsuring that the witness understood the seriousness of the matter or penalty for perjury. Coleman was not submitted to cross-examination. Finally, a jury was not permitted to observe the demeanor of the witness in making her statement. The final indicium of credibility was absent.
Therefore, we conclude the trial court erred in ruling that the statement of Zelwannica Coleman, implicating the defendant, did not violate the defendant's constitutional right of confrontation.

DECREE
For the reasons articulated, we VACATE the conviction and sentence, and REMAND the matter for a new trial consistent with the holdings in Williamson and Flores.
CONVICTIONS VACATED AND REMANDED.
SEXTON, J., dissents for reasons expressed in the original opinion.
HIGHTOWER, J., dissents, with reasons.
BROWN and CARAWAY, JJ., concur with written reasons.
BROWN, Judge, concurring.
If the majority opinion holds that the applicability of the hearsay exception provided by La.C.E. Art. 804(B)(3) depends on the degree of culpability of the declarant, I must disagree. To qualify the statement for admissibility, the declarant did not have to enhance her story to increase her stature to that of a "big fish."
Ms. Coleman's statement set forth the participation of each conspirator and clearly established her part in the planning and execution of the crimes. Her part was to lure the victims to the trap. Under the law, Ms. Coleman was a principal and is deemed equally culpable. Her narrative parallels the accounts of the two victims and is corroborated by all the evidence. Ms. Coleman's release on her own recognizance does not, by itself, casts doubt on the trustworthiness of her statement. Under these facts, Ms. Coleman's account is an exception to the hearsay rule under La.C.E. Art. 804(B)(3).
Five persons committed these crimes. The participation of Ms. Coleman and Ms. Kimble was the same. Ms. Coleman was murdered gangland style hours before the three male defendants voluntarily surrendered. The three male defendants and Ms. Kimble were convicted in a joint jury trial. This court reversed the convictions and acquitted the three male co-defendants, leaving only Ms. Kimble's conviction and 15-year sentence. Under these circumstances, I agree that Ms. Kimble is entitled to a new trial.
CARAWAY, Judge, concurring.
While I agree with the decision to remand this case for a new trial, I disagree with Judge Stewart's view that the confession of Zelwannica Coleman, the defendant's alleged accomplice, will be totally inadmissible. I do not believe that her statement was shown to be untrustworthy because of a state offer to her for favorable treatment. The issue of whether any portions of the statement are admissible and relevant evidence should be left for the state to argue and the trial judge to decide under the plurality of views expressed by the court in Williamson v. U.S., 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).
What is clear regarding the statement is that those portions of the confession naming Umekia Kimble were not statements made against the declarant's interests but merely statements made to spread the blame to another. Nevertheless, Coleman's statement regarding her agreement with the robbers to lure the victims into the trap which ultimately unfolded are genuinely self-inculpatory and possibly of probative value in the case.
As Justice O'Connor stated in Williamson:
Even the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor.
For instance, a declarant's squarely self-inculpatory confession"yes, I killed X" *567 will likely be admissible under Rule 804(b)(3) against accomplices of his who are being tried under a co-conspiratory liability theory. See Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). Likewise, by showing that the declarant knew something, a self-inculpatory statement can in some situations help the jury infer that his confederates knew it as well. And when seen with other evidence, an accomplice's self-inculpatory statement can inculpate the defendant directly: "I was robbing the bank on Friday morning," coupled with someone's testimony that the declarant and the defendant drove off together Friday morning, is evidence that the defendant also participated in the robbery.
Id. at 603, 114 S.Ct. at 2436.
In this case, the testimony of the victims establishes a parallel relationship between Coleman and the defendant and their actions. Sean Moch testified regarding the telephone conversation that the defendant apparently received from Coleman immediately before the robbers' intrusion into Moch's motel room. Therefore, upon remand, if an excised portion of Coleman's confession is urged by the state and is shown to be truly self-inculpatory, its relevancy and admissibility must be judged by a "careful examination of all the circumstances surrounding the criminal activity involved." Williamson, Id. at 604, 114 S.Ct. at 2437.
Finally, with regard to the issue of the Confrontation Clause of the Sixth Amendment, the Williamson court remanded the case with the view that some of the disputed confession might clearly be admissible evidence under the Rule 804(B)(3) exception to the hearsay rule. While Justice O'Connor then pretermitted the Confrontation Clause issue, I read her opinion and the opinions of the four other court members who concurred with the view of limited admissibility as implying that the Confrontation Clause would not be violated by the introduction of truly self-inculpatory statements.
HIGHTOWER, Judge, dissenting.
As revealed by these various dissenting and concurring opinions, at least three members of the five-judge rehearing panel agree that the confession by Zelwannica Coleman, the deceased co-conspirator, could properly be introduced into evidence. Additionally, even a fourth member suggests that portions of the statement may somehow achieve admissibility. Most interesting of all, the rehearing plurality's election to reverse Kimble's convictions hangs by the tenuous thread that to do otherwise, after her three male confederates all received appellate acquittals, would probably be unfair.
Equity, however, will ill serve as the polarstar precept in an arena of gangland homicides, kidnappings, drug deals, and burglaries. Indeed, to the contrary, when examined in the world of realities, the rehearing resolution will eventually absolve all the conspiratorsall except the murder victim, Coleman, who decided to cooperate with the police by divulging how the crimes transpired.
For the reasons assigned in the original majority opinion, Kimble's convictions should be affirmed.
I strongly dissent from the rehearing plurality's decision.
NOTES
[1] The separate appeals of Kimble's three codefendants appear in unpublished opinions. State v. Anderson, 27,956-KA (La.App. 2d Cir. 04/03/96), 673 So.2d 366; State v. Collins, 27,957-KA (La.App. 2d Cir. 04/03/96), 670 So.2d 809; State v. Powell, 27,959-KA (La.App. 2d Cir. 04/12/96), 677 So.2d 1008.
[2] Although she originally listed six assignments of error, Kimble now addresses only two. Assignments neither argued nor briefed are deemed abandoned. URCA-Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ denied.
[3] Anent standing to challenge a confession improperly obtained from a third party, see State v. Burdgess, 434 So.2d 1062 (La.1983); State v. Hawkins, 490 So.2d 594 (La.App. 2d Cir.1986), writ denied.
[4] Nor do we read Smith, supra, to herald such an expansive bar. Rather, the court in that instance found the conspirator's statement, by merely attempting to shift blame or curry favor, to be "presumptively" unreliable under Lee, supra.
[5] We do not find the identity, per se, of the male conspirators to be overwhelmingly significant in defendant's conviction. Coleman's statement links Kimble to a plan to kidnap and rob Moch and Gilliam. Consistent with that plot, and with the two women present at the scene, several masked men later assaulted those two individuals at the motel. Subsequently, in the presence of the jury, both victims identified defendant as being with them at the hotel on the night in question.
[6] While the record does not implicate Kimble directly in Coleman's homicide, the sentencing transcript notes that one of the other codefendants, Powell, may have been involved. In fact, Powell's cousin had by that time been arrested for the murder. Moreover, in sentencing defendant, the trial judge both mentioned the intimidation that had occurred against various state witnesses, in addition to members of Coleman's family, and recognized the likelihood that Coleman had been killed because she talked to the police.