h GASKINS, J.
The defendant, Jacobi Johnson, originally charged with second degree murder, was convicted by a jury of manslaughter. He was adjudicated a second felony offender and was sentenced to serve 21 years at hard labor without benefit of probation or suspension of sentence. The defendant appeals, claiming insufficiency of evidence upon which to base his conviction. For the following reasons, the conviction and sentence are affirmed.
FACTS
On January 16, 1994, the body of Zel-wanniea Coleman was found on South Lakeshore Drive near Cross Bayou in Shreveport. Coleman died as a result of one gunshot wound to the right side of her chin which severed her carotid artery. Shortly before her death, she was involved in a scheme with several other individuals in which two men were kidnapped from Bossier City, taken to Shreveport, and robbed. Although the defendant apparently did not take part in the robberies and kidnappings, informants notified law enforcement officials that he was involved in Coleman’s murder. On May 25, 1994, the defendant was indicted by grand jury for the second degree murder of Coleman. The defendant was convicted of the responsive verdict of manslaughter on March 8, 1996. On October 18, 1996, the defendant filed a motion for post verdict judgment of acquittal which was denied by the trial court. The defendant was then adjudicated a second felony habitual offender. On February 7, 1997, he was sentenced to serve 21 years at hard labor without bener fit of probation or suspension of sentence.[1] On January 26, 2000, the defendant applied to the district court for post | gconviction relief, seeking an out-of-time appeal. The trial judge denied the application. This court granted a supervisory writ and on remand, the trial judge granted the out-of-time appeal. On appeal, the *360 defendant argues only that the state failed to present sufficient evidence to support a conviction of manslaughter.
LEGAL PRINCIPLES
The standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
That standard, initially enunciated in Jackson v. Virginia, supra, and now legislatively embodied in La.C.Cr. P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Jackson, 34,076 (La.App.2d Cir.12/16/00), 774 So.2d 1046. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia, supra. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Owens, supra.
It is the function of the judge or jury to assess the credibility and resolve conflicting testimony. Where a trier of fact has made a rational determination, an appellate court should not disturb it. State v. Jackson, supra.
Under La. R.S. 14:24, all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. This rule has important qualifications, however. Only those persons who knowingly participate in the planning or execution of a crime are principals. State v. Knowles, 392 So.2d 651 (La.1980). Mere presence at the scene is j therefore not enough to “concern” an individual in the crime. See State v. Schwander, 345 So.2d 1173 (La.1977). Moreover, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Holmes, 388 So.2d 722, (La.1980); State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427.
Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm or when the offender is engaged in *361 the perpetration of an enumerated felony. La. R.S. 14:30.1.
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988).
Manslaughter includes homicide committed, without any intent to kill or cause great bodily harm, when the offender is engaged in the perpetration |fior attempted perpetration of any felony not enumerated in La. R.S. 14:30 or 30.1. La. R.S. 14:31. Such non-enumerated felonies include intimidation, impeding or injuring witnesses and obstruction of justice. As to intimidation of witnesses, La. R.S. 14:129.1 provides in pertinent part:
No person shall intentionally:
(a) Intimidate or impede, by threat of force or force, or attempt to intimidate or impede, by threat of force or force, a witness with intent to influence his testimony, his reporting of criminal conduct or his appearance at a judicial proceeding;
(b) Injure or attempt to injure a witness in his person or property with intent to influence his testimony, his reporting of criminal conduct or his appearance at a judicial proceeding;
[[Image here]]
For purposes of this Section a “witness” is a person (a) who is a victim of conduct defined as a crime under the laws of this state, another state or the United States, or (b) whose declaration under oath has been received in evidence in any court of this state, another state or the United States, or (c) who has reported a crime to a peace officer, prosecutor, probation or parole officer, correctional officer or judicial officer of this state, another state or the United States, or (d) who has been served with a subpoena issued under authority of any court of this state, another state or the United States.
A witness also shall include a person who reasonably would be believed by an offender to be a witness as previously defined in this Section....
Obstruction of justice is defined in La. R.S. 14:130.1 which provides in pertinent part:
A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
[[Image here]]
(2) Using or threatening force toward the person or property of another with the specific intent to:
(a) Influence the testimony of any person in any criminal proceeding;
(b) Cause or induce the withholding of testimony or withholding of records, documents, or other objects from any criminal proceeding;
_k- • • •
*362 (3) Retaliating against any witness, victim, juror, judge, party, attorney, or informant by knowingly engaging in any conduct which results in bodily injury to or damage to the property of any such person or the communication of threats to do so with the specific intent to retaliate against any person for:
(a) The attendance as a witness, juror, judge, attorney, or a party to any criminal proceeding or for producing evidence or testimony for use or potential use in any criminal proceeding,....
DISCUSSION
On December 30, 1993, Coleman and another woman lured two men to a hotel in Bossier City. Once they arrived, the two men were robbed and taken to Shreveport by several masked bandits. A couple of days later, Coleman was arrested. After speaking with her aunt, Coleman gave information that led to arrest warrants for five individuals, one of whom was Brian Keith Powell.[2] Coleman was released on January 12, 1994 on her own recognizance, just three days before her death.
While wanted on the Bossier arrest warrant, on January 15, 1994, Powell was dropped off at a local motel. Over the course of the day, the defendant, Terry Okray, Charles Ray Robinson, and Marion “Punkin” Howard joined him at the motel. The defendant did not testify at trial. However, he made several statements to law enforcement officials, which presented a comprehensive version of the day’s events. Investigator Greg Hall, the lead investigator on the case, testified that the defendant admitted that Powell told him earlier on the day of the murder and approximately one |7week before, that he intended to kill Coleman if she had told the police of his involvement in the Bossier City incident. The defendant’s recorded statement provided that on Sunday, January 9, “Keith Cobb”[3] told him that Coleman had been arrested and had a $100,000 bond, but was released on her own recognizance. Powell believed that Coleman had “ratted.” On Thursday, January 13, Powell told the defendant that there was a warrant out for Powell’s arrest. The defendant stated that he did not talk to Powell again until Saturday, January 15.
The defendant told Investigator Hall that on January 15, while at the motel, Powell received a page from Coleman and returned the call. The defendant noted in his recorded statement that prior to calling Coleman, Powell told the defendant that “[Powell] was going to set her up,” which the defendant took to mean, he was going to have her killed. The defendant drove a red convertible rented by his girlfriend when he, Powell, and Okray left to pick up Coleman at the intersection of Jewella and Lakeshore. Coleman sat in the back seat with Powell. The defendant’s statement provided that he thought they were going back to the motel but Powell told him to continue on Lakeshore. The defendant stated that Powell “got loud and started saying that [Coleman] told the police what happened.” Powell asked Coleman why she was out on a $100,000 bond on her own recognizance. The defendant then stated that “one thing led to another [and] he [Powell] told me to stop the car.” Okray, *363 Powell, and Coleman exited [Rthe vehicle, then Powell said “Did you rat on me? Now you ain’t going to be able to tell the police shit.” Then Okray produced a gun[4] from his waistband and shot Coleman in the chin or the face. Powell and Okray dragged the body from the shoulder of the road into a ditch. Powell told the defendant and Okray not to tell anyone about what just happened. In his statement, the defendant indicated that he was surprised by the killing and asked why they did not tell him what they were going to do. He also stated that he was scared.
The defendant, Okray, and Powell returned to the motel where the defendant removed all the towels from the room. The defendant admitted taking the towels and cleaning up the car. Upon his return to the motel, the defendant picked up Ok-ray and was in transit to Okray’s girlfriend’s house when Okray instructed the defendant to pull over. Okray then threw his gun into Cross Lake.
Others present at the motel presented versions of the events that differed in some respects to that conveyed by the defendant. Howard, an old girlfriend of Powell’s, stated that the defendant and Okray left the motel around 8:00 or 9:00 p.m. After their departure, she left for approximately 30 to 45 minutes to buy chicken and liquor. She expressed her belief that Powell remained in the room. She said that Okray and the defendant returned approximately one hour after they initially left and looked anxious. They took all the towels from the room and departed again. According to Howard, she left the motel with Robinson and Powell at approximately |all:00 p.m. that night. They took Robinson home and she dropped Powell off at an apartment complex. Her testimony was corroborated at trial by Robinson. Later that night, the defendant and Okray came to her home looking for Powell.
According to Okray’s girlfriend, Barbara Cooksey, Okray and the defendant picked her up at approximately 1:00 a.m. on January 16, 1994. They returned to the motel where she and Okray spent the night.
Although Okray asserted his constitutional right against self-incrimination while on the stand, his statements to the police regarding the events that evening were admitted without objection through the testimony of Investigator Hall. In his statement, Okray said he stayed in the motel room that night and the defendant and Powell left. He also stated that when the defendant picked him up earlier in the afternoon, he saw the defendant with a .45 caliber gun.
Powell did not testify, but his statement to the police was also admitted into evidence without objection through the testimony of Investigator Hall. Powell stated that he did not call Coleman that day. During the evening, he claimed that he remained at the motel when the defendant and Okray left.
Coleman’s aunt testified that Coleman met Powell at a hotel on Friday night, January 14.[5] She also testified that Coleman told her she was afraid of Powell. According to the aunt, Coleman received a call on the | inevening of January 15. Coleman did not identify the caller, but told her aunt that she was being picked up at a red light. Coleman asked her aunt for an *364 item of lingerie and some “sweet stuff,” meaning perfume.
Expert testimony established that Coleman suffered a gunshot wound from a large caliber weapon, such as a .45. The pattern of blood on the victim’s clothing shows that she was likely seated in the passenger side rear area when she was shot. A spent bullet was found in the trunk compartment, while a .45 cartridge was found underneath the seat and a bullet hole was found in the right rear corner of the passenger side. The back seat of the car was wet and blood was also found in the back seat. The expert testimony is inconsistent with the defendant’s statement that Coleman was killed outside of the car.
The defendant contends that Powell was angry that Coleman talked to law enforcement officials regarding the kidnappings and robberies and he intended to kill Coleman. The defendant argues that, although he knew this, was present when Coleman was killed, and cleaned up the car after the killing, he was just driving Powell to meet Coleman and did not know that the murder was about to take place. He claims that the state failed to prove his involvement in the killing or that he possessed the requisite specific criminal intent to kill or inflict great bodily harm on the victim. He further argues that the state failed to show that he knowingly or intentionally intimidated or attempted to intimidate the victim.
The evidence supports the jury’s findings that the defendant knew that Powell intended to kill Coleman. The defendant drove Okray, and h possibly Powell, to pick up Coleman on the evening of her death. According to Okray, the defendant had a .45 caliber weapon in his possession when he picked up Okray earlier that afternoon. Coleman was shot with a large caliber weapon, such as a .45, in the back seat of the car the defendant was driving. Coleman died as a result of this gunshot wound. The defendant cleaned up the vehicle in an attempt to cover up the crime. Therefore, the evidence shows that the defendant had the specific intent to kill or inflict great bodily harm upon Coleman.
The defendant was charged with second degree murder and the jury returned a verdict for manslaughter. If the evidence supports a conviction of the charged offense, the jury’s conviction of a responsive verdict must be upheld. State v. Jasper, 28,187 (La.App.2d Cir.6/26/96), 677 So.2d 553, writ denied, 96-1897 (La.2/21/97), 688 So.2d 521; State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989), writ denied, 567 So.2d 93 (La.1990). Of course,, the verdict is also valid if the evidence supports the responsive verdict actually rendered.
While the evidence is sufficient to support a conviction for second degree murder, the defendant was convicted only of manslaughter, a responsive verdict to second degree murder. The jury could have also found that the defendant committed felony manslaughter. The state presented evidence from which the jury could infer that the defendant was a principal in the crimes of intimidating, impeding, or injuring witnesses or obstruction of justice. La. R.S. 14:129.1; La. R.S. 14:130.1. These are non-enumerated felonies that require specific intent.
|12As set forth above, La. R.S. 14:129.1 makes it a crime for a person to “intentionally ... injure or attempt to injure a witness in his person ... with the intent to influence his testimony, his reporting of criminal conduct or his appearance at a judicial proceeding.” A witness is defined as “a person ... who has reported a crime to a peace officer.... ” Coleman fits the statutory definition of a witness because *365 she reported a crime to the Bossier City-Police Department. The defendant was aware that Powell wanted Coleman killed if she reported his involvement in the Bossier City incident to the police. The defendant further admitted that he drove Powell to pick up Coleman. The evidence supports the conclusion that Coleman was killed in the defendant’s car while the defendant was present. Therefore, a rational jury could find that the defendant was a principal to intimidation of a witness and that Coleman was killed during the perpetration of the offense.
Similarly, the jury could have concluded that the victim was killed during the perpetration of the offense of obstruction of justice. Obstruction of justice includes “retaliating against any witness ... or informant by knowingly engaging in any conduct which results in bodily injury to ... any such person ... with the specific intent to retaliate against any person for ... the giving of information, evidence, or any aid relating to the commission or possible commission of ... any crime.... ” La. R.S. 14:130.1. Obstruction of justice also requires knowledge that such act may affect future criminal proceedings. Based upon the evidence, a rational jury could have found that the defendant was a principal to this crime and that |isthe victim was killed during the commission of the offense, providing all the necessary elements to support a conviction for manslaughter.[6]
Therefore, the evidence is sufficient for a rational jury to conclude that the defendant committed the crime as charged, second degree murder, or the responsive verdict of manslaughter. Accordingly, the defendant’s argument that there is insufficient evidence upon which to base his conviction is without merit.
CONCLUSIONS
For the reasons stated above, we affirm the conviction and sentence of the defendant, Jacobi Johnson, for manslaughter.
AFFIRMED.

. La. R.S. 15:529.1(G) provides that all sentences imposed under the Habitual Offender Law shall be without benefit of probation or suspension of sentence.

. See State v. Kimble, 27,960 (La.App.2d Cir.5/8/96), 688 So.2d 552, and State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520, regarding the kidnapping and robbery charges.

. It appears that "Keith Cobb” or "Keith Cobbs” as described in the defendant's statement refers to Brian Keith Powell. When Investigator Hall refers to this incident, he states that the defendant spoke with Powell.

. Okray’s girlfriend testified that Okray purchased a .45 automatic about a month prior to this incident.

. The coroner testified that the presence of sperm in the vaginal swabs taken of Coleman indicated that she had engaged in sexual intercourse no more than 2-3 days before her death.

. See State v. Hall, 98-0667 (La.App. 4th Cir. 12/22/99), 750 So.2d 1105, writ denied, 2000-0483 (La.12/15/00), 777 So.2d 475; State v. Meyers, 95-750, 96-35, 96-395 (La.App. 5th Cir. 11/26/96), 683 So.2d 1378, writs denied, 97-0015 (La.5/9/97), 693 So.2d 766, 98-2530 (La.2/5/99), 737 So.2d 745, 2000-0995 (La.12/8/00), 775 So.2d 1079; State v. Smith, 26,661 (La.App.2d Cir.3/1/95), 651 So.2d 890, writ denied, 95-0918 (La.9/15/95), 660 So.2d. 458, where drivers were found guilty of second degree murder. See also State v. Cazenave, 2000-183, 00-184 (La.App. 5th Cir. 10/31/00), 772 So.2d 854, writ dismissed, 2000-3386 (La.2/16/01), 785 So.2d 835, writ denied, 2000-3297 (La.10/26/01), 799 So.2d 1151, where a driver was found to be a principal to second degree murder.