**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                          No. 98-4060

TOMMY PABELLON,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

BOB HARRY FOWLER, a/k/a Richard
B. Fowler, a/k/a Slim Fowler, a/k/a
                                                                            No. 98-4088
Richard Bob Fowler, a/k/a Bob
Harris Fowler, a/k/a Georgia Slim,
a/k/a Georgia Slim Fowler, a/k/a
Georgia Fowler,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
Henry M. Herlong, Jr., District Judge.
(CR-97-487)

Argued: March 5, 1999

Decided: May 14, 1999

Before WILLIAMS and MICHAEL, Circuit Judges, and
MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Randall Scott Hiller, RANDALL S. HILLER, P.A., Greenville, South Carolina, for Appellant Pabellon; Richard Walter Vieth, Spartanburg, South Carolina, for Appellant Fowler. Harold Watson Gowdy, III, Assistant United States Attorney, Greenville, South Carolina, for Appellee. **ON BRIEF:** J. Rene Josey, United States Attorney, Greenville, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On July 22, 1997, Tommy Pabellon, Bob Harry Fowler, and Darrell Young (Defendants) were indicted by a federal grand jury for their role in the shooting death of Ricky Samuel, [1] a Government

_____

[1] All three Defendants were named in a four-count indictment. Count One charged Defendants with murdering Samuel to prevent his attendance and testimony at Pabellon's trial on federal drug charges in violation of 18 U.S.C.A. § 1512(a)(1)(A) (West Supp. 1999) and aiding and abetting the same in violation of 18 U.S.C.A. § 2 (West 1969). Count Two charged Defendants with murdering Samuel in retaliation for his having provided the Government with information regarding Pabellon's drug operations in violation of 18 U.S.C.A. § 1513(a)(1)(B) (West Supp. 1999) and aiding and abetting the same in violation of 18 U.S.C.A. § 2. Count Three charged Defendants with murdering Samuel in retaliation for his having testified before the federal grand jury that indicted Pabellon on federal drug charges in violation of 18 U.S.C.A. § 1513(a)(1)(A) (West Supp. 1999) and aiding and abetting the same in violation of 18 U.S.C.A. § 2. Count Four charged Defendants with using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C.A. § 924(c) (West Supp. 1999).

2

informant who, at time of his death, had provided the Government with information regarding Pabellon's drug operations, had testified before the federal grand jury that indicted Pabellon on federal drug charges, and had been scheduled to be the key Government witness at Pabellon's then-upcoming trial on federal drug charges. Young pleaded guilty to one count of aiding and abetting the murder of Samuel and agreed to testify against Pabellon and Fowler. After a jury trial, Pabellon and Fowler (Appellants) were found guilty on all counts and sentenced to four life sentences, each to run concurrently.

On appeal, both Pabellon and Fowler contend that the district court erred in denying their motion to sever the trial. In addition, Pabellon contends that the district court erred in admitting into evidence the redacted statement of a deceased unindicted co-conspirator and in refusing to call as a court's witness an individual who had recanted his earlier statement to the Government. Finally, Fowler contends that the evidence was insufficient to support his convictions. With the exception of two of Fowler's insufficiency of the evidence claims, we find no reversible error. As for those two claims, we agree with Fowler that the Government failed to introduce any evidence that he murdered Samuel in retaliation for Samuel having provided the Government with information regarding Pabellon's drug operations (Count Two), or in retaliation for Samuel having testified before the federal grand jury that indicted Pabellon on federal drug charges (Count Three). Rather, the evidence established only that Fowler murdered Samuel to prevent Samuel's attendance and testimony at Pabellon's trial on federal drug charges (Count One). Accordingly, while we affirm Pabellon's convictions in whole, we affirm Fowler's convictions in part and reverse in part.

I.

In 1995, Ricky Samuel was indicted by a federal grand jury for his role in a large drug conspiracy in Spartanburg, South Carolina. In exchange for his being allowed to plead guilty to simple possession of cocaine, Samuel agreed to cooperate with local and federal law enforcement agents in their continuing investigation into drug trafficking in the greater Spartanburg area.

In February 1996, Samuel purchased, pursuant to an undercover police operation, crack cocaine from Pabellon. During the transaction,

3

Pabellon's friend, Bryant Woodruff, remained in the car. The transaction was recorded and observed by local and federal law enforcement agents. No arrests were made. On March 8, 1996, Samuel participated in a second controlled buy. On this occasion, Samuel purchased crack cocaine from Pabellon and Brian Freeman. Once again, the transaction was recorded and observed by local and federal law enforcement agents. This time, however, Pabellon and Freeman were arrested shortly after making the exchange.

Pabellon was subsequently indicted by a federal grand jury, before which Samuel testified, for conspiracy to possess with intent to distribute crack cocaine and distribution of crack cocaine. Freeman was charged with possession with intent to distribute crack cocaine. Woodruff, however, was not charged with any violation stemming from his participation in the February drug transaction. Pursuant to the U.S. Attorney's Office's "open file" policy, Pabellon and Freeman were informed that Samuel had been working as a Government informant.

On May 14, 1996, Samuel's body was found near a pond outside Greenville, South Carolina. According to the autopsy report, Samuel had been shot twice in the back of the head. Although the Government no longer had its key witness, the case against Pabellon went to trial in July of 1996. After one day of trial, Pabellon pleaded guilty to conspiracy. Freeman refused to plead guilty and was eventually convicted of possession with intent to distribute crack cocaine.

Shortly after Freeman was convicted, he approached the Government with information about Samuel's murder.[2] Based on the information provided by Freeman, the Government began investigating his allegations that Pabellon had Samuel killed to prevent his attendance at Pabellon's drug conspiracy trial. During the course of the Government's investigation, federal agents interviewed Woodruff, who was awaiting trial on unrelated drug charges. During the interview, Woodruff provided oral and written statements to the Government concerning his involvement in the murder of Samuel. Woodruff stated that

_____

[2] Freeman also had information, which he shared with the Government, concerning a threat against a federal prosecutor and a Spartanburg County Sheriff's deputy.

4

Pabellon enlisted his aid to find an individual to murder Samuel. Woodruff asked his friend Darryl Young for help. Young in turn located Bob Harry Fowler. According to Woodruff, Pabellon gave him $15,000 to kill Samuel. Woodruff gave the $15,000 to Young. Young kept $10,000 and paid Fowler $5,000. In April of 1997, Woodruff hanged himself in federal prison.

On July 22, 1997, Fowler, Pabellon, and Young were named in a four-count indictment. Count One charged Defendants with murdering Samuel to prevent his attendance as a witness in federal court in violation of 18 U.S.C.A. § 1512(a)(1)(A) (West Supp. 1999) and aiding and abetting the same in violation of 18 U.S.C.A. § 2 (West 1969). Count Two charged Defendants with murdering Samuel in retaliation for his providing to a law enforcement officer information relating to the commission of a federal offense in violation of 18 U.S.C.A. § 1513(a)(1)(B) (West Supp. 1999) and aiding and abetting the same in violation of 18 U.S.C.A. § 2. Count Three charged Defendants with murdering Samuel in retaliation for his giving information in an official proceeding in violation of 18 U.S.C.A. § 1513(a)(1)(A) (West Supp. 1999) and aiding and abetting the same in violation of 18 U.S.C.A. § 2. Count Four charged Defendants with using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C.A. § 924(c) (West Supp. 1999). Young pleaded guilty to one count of aiding and abetting the murder of Samuel and agreed to testify for the Government.

On September 30, 1997, the Government filed a motion in limine seeking to admit into evidence a redacted portion of Woodruff's statement pursuant to Rule 804(b)(3) of the Federal Rules of Evidence (statement against penal interest). The district court withheld its ruling on the motion until Pabellon's and Fowler's trial, which began on November 12, 1997. Ultimately, the district court, over objection, allowed the Government to put into evidence the following redacted portion of Woodruff's statement:

> X came to me in March of 1996 and asked me if I knew anyone that could have Samuel killed. I said no, but I could see. I contacted Darrell Young and asked Young. Young got back to me in a couple of months and said he had someone

5

> for the job. I went back to X, got the money, I gave the
> money to Darrell Young.

(J.A. at 613-14.)

At trial, the Government called Freeman as a witness. Freeman testified that Pabellon said that he was going to "get" Samuel, because he knew that Samuel had "set him up." (J.A. at 271.) According to Freeman, Pabellon also asked his attorney, Al Taylor, what would happen if Samuel did not show up for trial. In response, Taylor allegedly told Pabellon that the Government would no longer have a case against him. In addition, Freeman testified that Pabellon suggested that he (Freeman) kill Samuel so that the Government would not have a case against him either. Freeman also testified that he overheard Pabellon and Woodruff having a discussion on the night Pabellon pleaded guilty. Freeman testified that he heard Pabellon say "Damn man, we killed that damn boy for nothing. I went up there and pled guilty to ten years today." (J.A. at 296.)

Pabellon's wife, Sonji, also testified for the Government. Sonji stated that Pabellon and Woodruff sold drugs together and were close friends. After Pabellon's arrest, Sonji testified that Pabellon knew that Samuel had set him up, and that Pabellon showed Woodruff the evidence the Government had obtained against him, which included a report detailing Samuel's role as an informant. Sonji also testified that during one visit to Taylor's office, Pabellon and Taylor discussed other cases where witnesses did not show up for court, including a case where a witness was killed. In addition, Sonji testified that in late April or early May of 1996, Pabellon removed $15,000 from their safe. Finally, Sonji testified that after Samuel's body was found, she heard Pabellon tell Woodruff, "Well, I paid . . . fifteen thousand dollars and you never did do nothing." (J.A. at 380.)

Xavier Barnette testified that Pabellon came to him in the spring of 1996 and told him that Samuel was a "snitch," (J.A. at 242), and asked him to "handle" the situation, (J.A. at 244). Barnette, who is six-feet eight inches tall and had a reputation for roughing up people, testified that the common meaning on the street for the term "handle" was to "send a message," "break an arm," or "beat them up bad." (J.A. at 244.) Barnette did nothing to Samuel and two weeks later Pabellon

6

informed Barnette, "Man, I got to have something done about that soon." (J.A. at 245.) Barnette also testified that Pabellon made a motion with his hands -- that he (Barnette) interpreted to mean kill Samuel -- and stated, "Man, somebody need to do that kid." (J.A. at 245.) Barnette informed Pabellon that he, Barnette, was not a killer.

Young, pursuant to his plea agreement, testified that he and Woodruff were best friends. Young testified that Woodruff came to him in the spring of 1996 and asked if Young could have Samuel killed. After several more requests, Young agreed to help find someone to kill Samuel. Young located Fowler at a men's clothing store in Greenville where Fowler was working. Young told Fowler that he had a friend in trouble with the law and that somebody (Samuel) was going to "finger" the friend on a drug conspiracy. Young informed Fowler that he needed this person taken care of. After Young promised to provide Fowler with transportation, Fowler agreed to kill Samuel for $5,000.

Young testified that he introduced Fowler to Lillie Young (Lillie), who agreed to lend Fowler her turquoise-colored Mazda MX-6. Now that he had transportation, Fowler told Young that he would drive to Samuel's home, where he would introduce himself to Samuel as the Reverend James. Fowler believed that he could get close to Samuel posing as a reverend because most people trust religious people. Young also testified that Fowler always carried a blue saddlebag that contained a Bible and a gun. Fowler later reported to Young that Samuel believed that he was a minister and that he (Fowler) had a chance to kill Samuel at his home in Spartanburg while they were praying, but that someone walked in on them.

On May 14, 1996, Fowler paged Young -- Fowler's code for pagers was "666" -- from a car wash to tell Young that he had killed Samuel. Young and Fowler met later that day at a nightclub, at which time Young paid Fowler $5,000. At that meeting, Fowler told Young that he had picked Samuel up at the Probation Office in Spartanburg. After driving Samuel to a rural area, he placed a gun to Samuel's head and walked him down to a lake. Fowler told Samuel that he was a professional hit man from Alabama. When Samuel pleaded for his life, Fowler told him to "quit begging," (J.A. at 91), and to keep moving so that he could "get it over with," (J.A. at 448). Fowler told

7

Young that he shot Samuel twice in the back of the head. After discussing the details of the murder, Fowler and Young returned the Mazda MX-6 to Lillie.

Lillie testified that Young and Fowler borrowed her turquoise-colored Mazda MX-6 several weeks prior to May 14, 1996. She also testified that when Young and Fowler returned her car on May 14, 1996, it was unusually clean. After Young left, Lillie and Fowler went on a shopping spree. While shopping, Fowler, although unemployed at the time, spent nearly $1,000 in cash.[3]  Among other things, Fowler spent $500 on a rental car.[4]

Tameka Shell testified that she was Samuel's girlfriend at the time of his murder. Shell testified that 2-3 weeks before Samuel was killed, a man calling himself Reverend James came to Samuel's house. Among other things, the Reverend James gave Samuel a Bible. She identified Fowler as the person posing as the Reverend James.[5] Shell also testified that on the morning of May 14th, Fowler, posing as the Reverend James, drove Samuel to the Probation Office in a turquoise-colored Mazda MX-6.

Detective Larry Bellew testified that during the search of Samuel's home, he found a Bible. Fingerprints lifted from that Bible were compared to a known sample of Fowler's fingerprints. The fingerprints from the Bible matched Fowler's. Detective Eugene Donohue testified that a subsequent search of Fowler's home produced a blue saddlebag and a scrapbook with Young's phone number. Detective Donohue also testified that Fowler's residence was near the pond where Samuel's body was found.

At trial, the defense argued, among other things, that Woodruff had Samuel killed and that Young was the triggerman. On November 18,

_____

[3] Fowler quit his job selling men's clothing, where he had earned only $5 an hour, shortly after agreeing to kill Samuel. Fowler did not start working again until January of 1997.
[4] The Government introduced a receipt from the car rental office where Lillie Young took Fowler to rent the car.
[5] Samuel's brother, Jerome, also identified Fowler as the individual who had come to their home purporting to be the Reverend James.

8

1997, the jury rejected the defense's theory of the case and returned a guilty verdict against both Fowler and Pabellon on all four counts of the indictment. On January 21, 1998, Fowler and Pabellon were sentenced to four life sentences, each to run concurrently. This appeal followed.

On appeal, Appellants raise several challenges to their convictions.[6] Both contend that the district court erred in denying their motion to sever the trial. In addition, Pabellon contends that the district court erred in admitting into evidence the redacted statement of Woodruff and in refusing to call as a court's witness an individual who had recanted his earlier statement to the Government. Finally, Fowler contends that the evidence was insufficient to support his convictions. We address these arguments in turn.

II.

On appeal, Appellants first argue that the district court erred in denying their motion to sever the trial. In particular, they contend that there was no basis for a joint trial under Rule 8 of the Federal Rules of Criminal Procedure. In the alternative, Pabellon argues that the joint trial was unduly prejudicial and, therefore, should have been severed pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Severance is a matter "committed to the sound discretion of the district court." United States v. Tedder, 801 F.2d 1437, 1450 (4th Cir. 1986). Thus, the denial of a motion to sever should not "be disturbed unless the denial of a severance deprives the defendants of a fair trial and results in a miscarriage of justice." United States v. Becker, 585 F.2d 703, 706 (4th Cir. 1978).

Despite Appellants' contentions to the contrary, Rule 8(b) of the Federal Rules of Criminal Procedure provided a basis for the joint trial in this case. The test for joinder under Rule 8(b) is simply whether defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions." Fed. R. Crim. P. 8(b). Here, both Pabellon and Fowler are alleged to have participated in the murder of Samuel to prevent his testimony at Pabel-

_____

**6** Appellants do not challenge their sentences on appeal.

lon's trial. Pabellon initiated the murder for hire scheme and Fowler carried out the scheme. As a result, the requirements of Rule 8 were satisfied in this case.

Moreover, it is worth noting that Pabellon and Fowler were indicted together. In light of Rule 8, "[t]here is a preference in the Federal System for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993). Thus, "[b]arring special circumstances, individuals indicted together should be tried together." United States v. Brugman , 655 F.2d 540, 542 (4th Cir. 1981); see also United States v. Shuford , 454 F.2d 772, 775 (4th Cir. 1971) (same).

One such special circumstance is contained in Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 provides that a district court may grant a severance of defendants "[i]f it appears that a defendant or the government is prejudiced by a joinder of . . . defendants in an indictment." Fed. R. Crim. P. 14. The mere showing of some prejudice, however, is not enough to establish a special circumstance. See Zafiro, 506 U.S. at 538-40. Rather, a miscarriage of justice must occur to require a severance. See Richardson v. Marsh, 481 U.S. 200, 206-11 (1987).

Here, Pabellon argues that he was prejudiced by the joint trial and, therefore, that the district court should have severed the trial pursuant to Rule 14. Specifically, Pabellon contends that there was more evidence, including physical evidence, against Fowler than there was against him and that he would have had a better chance of acquittal if tried separately. As this Court noted in United States v. Riley, 991 F.2d 120 (4th Cir. 1993), however, there is no right to severance merely because the evidence against one defendant is stronger or weaker than the evidence against another defendant. See id. at 125. Moreover, a miscarriage of justice does not occur simply because a separate trial would offer a defendant a better chance of acquittal. See United States v. Spitler, 800 F.2d 1267, 1271-72 (4th Cir. 1986). In sum, there is no evidence that "a joint trial would [have] compromise[d] a specific trial right of one of the defendants, or prevent[ed] the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. As a result, the requirements of Rule 14 were not satisfied in this case.

10

III.

Next, Pabellon contends that the district court erred in admitting into evidence the redacted statement of a deceased unindicted co-conspirator.[7] Specifically, Pabellon argues that the statement, made by Bryant Woodruff, was not admissible pursuant to Rule 804(b)(3) of the Federal Rules of Evidence as a statement against penal interest because the statement was clearly exculpatory.[8] A district court's evi-

---

[7] The statement was redacted pursuant to Bruton v. United States, 391 U.S. 123 (1968) (holding that the admission of an accomplice's statements against interest that also incriminated the defendant violated the defendant's Confrontation Clause rights where the declarant was unavailable for cross examination).

[8] Pabellon does not argue that the admission of the redacted statement violated the Confrontation Clause. In Ohio v. Roberts, 448 U.S. 56 (1980), the Supreme Court noted that a statement is admissible and does not violate the Confrontation Clause where there is a necessity (i.e., the witness is unavailable) and the statement bears sufficient "indicia of reliability" in that it falls within a "firmly rooted hearsay exception," or has "particularized guarantees of trustworthiness" such that "there is no material departure from the reason of the general rule." Id. at 65-66. In Lee v. Illinois, 476 U.S. 530 (1986), the Supreme Court noted that confessions have a rebuttable "presumption of unreliability" and do not fall within a "firmly rooted" hearsay exception. Id. at 543. In footnote 5, the Court also seemed to reject a broad application of the statement against penal interest exception to allow the admissibility of confessions, observing that the "concept defines too large a class for meaningful Confrontation Clause analysis." Id. at 544 n.5. After Lee, the question remains whether statements against penal interest can qualify as a firmly rooted hearsay exception as a class or whether each statement must qualify through its particularized guarantee of trustworthiness. Cf. United States v. Moses, 148 F.3d 277, 281 (3d Cir. 1998) (declining to decide if firmly rooted), cert. denied, 119 S. Ct. 1047 (1999); United States v. Keltner, 147 F.3d 662, 671 (8th Cir.) (firmly rooted), cert. denied, 119 S. Ct. 574 (1998); LaGrand v. Stewart, 133 F.3d 1253, 1268-69 (9th Cir.) (suggesting firmly rooted in dicta), cert. denied, 119 S. Ct. 422 (1998); Neuman v. Rivers, 125 F.3d 315, 319 (6th Cir.) (firmly rooted), cert. denied, 118 S. Ct. 631 (1997); Earnest v. Dorsey, 87 F.3d 1123, 1131 (10th Cir. 1996) (not firmly rooted); United States v. Trenkler, 61 F.3d 45, 62 (1st Cir. 1995) (assuming firmly rooted); United States v. Matthews, 20 F.3d 538, 544-46 (2d Cir. 1994) (declining to decide if firmly rooted); United States v. Flores, 985 F.2d 770, 775-76 (5th Cir. 1993) (not firmly rooted); United States v. York, 933 F.2d 1343, 1363 (7th Cir. 1991) (firmly rooted). That issue is not before us today.

11

dentiary rulings are reviewed under the narrow abuse of discretion standard. See United States v. Sanchez, 118 F.3d 192, 195 (4th Cir. 1997).

A statement is against interest if, "at the time of its making[, it] . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3). Moreover, as the Supreme Court made clear in Williamson v. United States, 512 U.S. 594, 603 (1994),"[e]ven statements that are on their face neutral may actually be against the declarant's interest."

The district court allowed the Government to admit into evidence the following statement:

> X came to me in March of 1996 and asked me if I knew anyone that could have Samuel killed. I said no, but I could see. I contacted Darrell Young and asked Young. Young got back to me in a couple of months and said he had someone for the job. I went back to X, got the money, I gave the money to Darrell Young.

(J.A. at 613-14.) Despite Pabellon's contentions to the contrary, the admitted statement was clearly inculpatory. In the statement, Woodruff admitted that he aided and abetted the murder of Samuel. Indeed, he admits that he actually helped find the hit man who killed Samuel. As a result, the statement actually subjected Woodruff to criminal liability.

Moreover, in December of 1996, when Woodruff made his statement, he had not been arrested or indicted for the murder of Samuel. In fact, no witness had yet come forward implicating Woodruff in the murder. Rather, Woodruff came to the authorities on his own initiative. In addition, the Government made no offer of leniency or immunity to Woodruff in exchange for his statement. As such, unlike a defendant who is caught red-handed and then begins to cooperate in order to get a deal, Woodruff had no reason to lie. Thus, at the time the statement was made, "a reasonable person in the declarant's position would not have made the statement unless believing it to be true."

12

Fed. R. Evid. 804(b)(3). Accordingly, the district court did not abuse its discretion in admitting the statement into evidence.**9**

IV.

Pabellon also contends that the district court erred in refusing to call as a court's witness a Government witness who had recanted his earlier statement. "[T]he utilization of court witnesses is a matter within the discretion of the trial judge." United States v. Karnes, 531 F.2d 214, 216 (4th Cir. 1976). For the reasons that follow, we conclude that Pabellon's argument is without merit.

During its case in chief, the Government called Scott Miller as a witness. Miller had previously told the Government that Pabellon had approached him about having Samuel killed. On the stand, however, Miller denied making such a statement. The district court, out of the presence of the jury, questioned Miller about his testimony. Miller admitted that he had lied to the FBI about Pabellon approaching him to have Samuel killed. The district court informed the Government that it could not call Miller as a witness because he had recanted his story and the Government would be calling Miller as a witness solely to impeach him with a prior inconsistent statement.

Pabellon's counsel then asked the Court to call Miller as a court witness. The district court refused on the ground that it did not believe that Miller was credible. Nevertheless, the district court informed Pabellon's counsel that Pabellon could call Miller as a witness during his defense. Pabellon did call Miller as a witness.

_____

**9** We note that the defense only objected to certain portions of Woodruff's statement being put before the jury, i.e. , the first two sentences and the first half of the fifth sentence. In fact, because the defense argued at trial that Woodruff had Samuel killed, the defense actually wanted the district court to admit that portion of Woodruff's statement wherein he said: "I contacted Darrell Young and asked Young. Young got back to me in a couple of months and said he had someone on the job. . . . I gave the money to Darrell Young." (J.A. at 411.) The district court correctly noted, however, that taking the statement out of context, like the defense requested, "would [make it] sound like . . . Woodruff was admitting he started this, when in essence his statement definitely implicates someone else as [requesting the hit and] bringing him the money." (J.A. at 411.)

Although Rule 614 of the Federal Rules of Evidence allows a district court to call witnesses at the suggestion of a party, the district court need not call an admitted liar as a witness, especially when the witness can be (and in this case was) called by the defense. Pabellon cites no rule, and certainly none exists, that requires a district court to call a witness that has recanted the statement he gave to the authorities.

V.

Finally, Fowler contends that the district court erred in denying his motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure on Counts I-IV because the evidence was insufficient to support his convictions. When assessing the sufficiency of the evidence of a criminal conviction on direct review, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." See Glasser v. United States, 315 U.S. 60, 80 (1942).

As an initial matter, we note that the Government introduced overwhelming evidence that, for purposes of 18 U.S.C.A.§ 1111(a), Fowler killed Samuel. Fowler was not indicted for just first-degree murder, however. Rather, the first three counts of the indictment alleged that Fowler killed Samuel for the reasons stated in the charged statutes. Count One, for example, charged Fowler with the murder of Samuel to prevent his attendance as a witness in federal district court in violation of 18 U.S.C.A. § 1512(a)(1)(A).

On appeal, Fowler argues that the Government failed to introduce any evidence that he killed Samuel to prevent his attendance and testimony in federal district court as Count One alleged. On this point we agree with the Government; there is no requirement under the statute in question that the Government prove that Fowler knew the federal nature of the proceeding in which Samuel was to participate. Indeed, § 1512 provides, in pertinent part, as follows:

> (f) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance --

14

(1) that the official proceeding before a judge, court, magistrate, grand jury, or government agency is before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

(2) that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

18 U.S.C.A. § 1512(f); see also United States v. Bell, 113 F.3d 1345, 1349 (3d Cir.) (noting that the statute is clear that the Government need not prove any "state of mind" on the part of the defendant with respect to the federal character of the proceeding or officer), cert. denied, 118 S. Ct. 447 (1997).

Thus, the Government had to prove (with respect to Count One) that Fowler's motivation in killing Samuel was to prevent him from testifying in a proceeding that was in fact federal in nature, not that Fowler knew that it was federal in nature. Here, there was ample evidence that Samuel was participating in a federal proceeding. Samuel was a documented federal informant at the time of his death; Samuel was scheduled to testify against Pabellon in federal court; and the local agents with whom Samuel worked were assigned to a U.S. Attorney's Office Task Force. Moreover, the record is clear that Fowler knew that the reason Samuel "needed [to be] . . . taken care of" was because he was going to finger one of Darrell Young's friends in court. Because there is substantial evidence that the proceeding at which Samuel was to testify was federal in nature, the verdict of the jury as to Count One must be sustained.

Count Two charged Fowler with the murder of Samuel in retaliation for his having provided to a law enforcement officer information relating to the commission of a federal offense in violation of 18 U.S.C.A. § 1513(a)(1)(B) or aiding and abetting the same in violation of 18 U.S.C.A. § 2. We agree with Fowler that the Government estab-

15

lished only that Fowler knew that Samuel was going to "finger" one of Young's friends (Pabellon) in court. The Government failed to introduce any evidence that Fowler knew that Samuel had already provided law enforcement with information regarding Pabellon's drug dealing. Consequently, there is insufficient evidence that Fowler killed Samuel in retaliation for his having provided such information in violation of § 1513(a)(1)(B).[10]

Count Three charged Fowler with the murder of Samuel in retaliation for his having testified in a federal proceeding in violation of 18 U.S.C.A. § 1513(a)(1)(A) or aiding and abetting the same in violation of 18 U.S.C.A. § 2. As we noted above, the Government established only that Fowler knew that Samuel was going to "finger" one of Young's friends (Pabellon) in court. The Government simply failed to introduce any evidence that Fowler knew that Samuel had already testified against Pabellon in a federal proceeding. Consequently, there is also insufficient evidence that Fowler killed Samuel in retaliation for his having provided such information in violation of § 1513(a)(1)(A).

Finally, Count Four charged Fowler with using or carrying a firearm during and in relation to a drug trafficking crime in violation of

_____

[10] When a case is submitted to a jury on two adequate legal theories and the jury returns a general verdict of guilty, affirmance is appropriate so long as the evidence is sufficient to support a conviction on either theory. See Griffin v. United States, 502 U.S. 46, 56-60 (1991); cf. Yates v. United States, 354 U.S. 298, 312 (1957) (explaining that when a jury has been instructed on two legal theories, one of which is legally inadequate, the conviction must be reversed if it is not possible to determine whether the jury convicted on the legally adequate, or inadequate, theory). Here, Fowler was also charged with aiding and abetting. To find Fowler guilty as an aider and abetter to the crime charged in Count Two pursuant to 18 U.S.C.A. § 2(a) (West 1969), the Government had to prove beyond a reasonable doubt that someone committed each of the essential elements of the offense charged in Count Two. It was the Government's theory that Fowler, not Pabellon, was guilty of the substantive offense, and that Pabellon was guilty of aiding and abetting. Without evidence that someone besides Fowler committed each of the essential elements of the offense charged in Count Two, there is insufficient evidence to find Fowler guilty of aiding and abetting pursuant to § 2(a).

16

18 U.S.C.A. § 924(c). At trial, the Government introduced evidence that Pabellon, Woodruff, and Young continued to sell crack cocaine after Pabellon's arrest in March 1996. Moreover, when Young approached Fowler about killing Samuel, he specifically informed Fowler that Samuel was going to "finger" one of his friends in the drug conspiracy. By agreeing to kill Samuel, Fowler joined the drug conspiracy. See United States v. Roberts, 881 F.2d 95, 101 (4th Cir. 1989) (noting that a defendant has joined a conspiracy if he understands "the unlawful nature thereof and willfully joins in the plan on one occasion"). Indeed, a defendant may join a drug conspiracy without knowing "the particulars of the conspiracy or all of his coconspirators." United States v. Burgos, 94 F.3d 849, 858 (4th Cir. 1996) (en banc). Because Samuel was killed by Fowler in furtherance of a drug conspiracy, there was sufficient evidence to find Fowler guilty on Count Four.

VI.

For the foregoing reasons, Pabellon's convictions are affirmed in whole and Fowler's convictions are affirmed in part and reversed in part.**11** Although Fowler remains subject to two life sentences for his

_____

**11** Although we reverse Fowler's convictions on Counts Two and Three, we need not sua sponte reverse Pabellon's convictions on those same counts. The jury was correctly instructed that it could find Pabellon guilty as a principal pursuant to 18 U.S.C.A. § 2(b) (West 1969), if he willfully caused Fowler to perform an act that, if directly performed by Pabellon, would be an offense against the United States. Here, the evidence was overwhelming that Pabellon caused Fowler to kill Samuel. Had Pabellon directly killed Samuel, it would be an offense pursuant to both 18 U.S.C.A. § 1513(a)(1)(A) (West Supp. 1999) and 18 U.S.C.A. § 1513(a)(1)(B) (West Supp. 1999). Without question, the Government established that Pabellon knew that Samuel had provided law enforcement with information regarding his drug dealing and that Samuel had testified against him in a federal proceeding. Consequently, had Pabellon directly done what he caused Fowler to do, i.e. , kill Samuel, there was sufficient evidence from which a jury could conclude that Pabellon violated § 1513(a)(1)(A) and § 1513(a)(1)(B). Thus, Pabellon could be convicted of Counts Two and Three under § 2 even if there was insufficient evidence to convict Fowler of both counts under § 1513(a)(1)(A) and § 1513(a)(1)(B).

17

convictions on Counts One and Four, we remand for the district court to vacate Fowler's convictions on Counts Two and Three.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

18